<u>AFFIDAVIT</u>

I, Mark Persson, being duly sworn, depose and state as follows:

<u>AGENT BACKGROUND</u>

1.      I am Special Agent (SA) with the Drug Enforcement Administration (DEA) and a law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code.  I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been a Special Agent with the DEA since September 2014.  Prior to working at the DEA, I was employed by the Stafford County (Virginia) Sheriff's Office since October 2007 as a patrol deputy, property crime detective, and narcotics detective. I am assigned to the DEA's Burlington Resident Office (BRO).  In connection with my duties and responsibilities as a Special Agent, I have received extensive training in the field of narcotics investigation and enforcement:  I have received training, both formal and informal, in the investigation of violations of controlled substance offenses, including several schools regarding general narcotics investigation; and I completed the DEA Basic Agent Training Academy, located in Quantico, Virginia.  In total, I have received approximately 18 weeks of specialized training at the DEA Academy, including in classes regarding the conducting of narcotics investigations (interdiction, identification, smuggling, clandestine manufacture of drugs, methods of packaging, distribution of drugs, undercover operations, the laundering of drug proceeds, asset forfeiture, use of confidential sources, cooperating witnesses, and other sources of information) and the legal aspects of conducting drug investigations. I have also participated in investigations

1

relating specifically to the possession and distribution of heroin and cocaine base, the type of

drugs that are being distributed by the target subjects under investigation and discussed herein. I

have also participated in various aspects of investigatory work, including undercover surveillance

and undercover narcotics purchases, and have participated in several narcotics-related arrests and

the execution of many narcotics-related search warrants. I have written affidavits in support of

search and arrest warrants and frequently utilized the services of informants, and other

confidential sources of information. I have also interviewed defendants regarding various

criminal activities, especially narcotics trafficking. These interviews have included discussions of

the use and meaning of code words in the sales and distribution of controlled substances. I have

testified in grand jury proceedings. I have participated in a prior wiretap investigation in my

capacity as a DEA agent, and as such, I am familiar with the terminology and distribution

methods used by drug traffickers, as well as the methods of packaging, transporting, and

ingesting numerous types of controlled substances.

     3.     I submit this affidavit for two purposes. First, this affidavit is submitted to show

that probable cause exists to believe that from in or about August 2015 to in or about March

2018, Korey STEWART,[1] aka Corey Adams, aka Corethious Bryant, aka Keith Young, aka

Steven Allen, aka "Skip," aka "Gutta," aka "Slim," aka "Dash," ▮▮▮▮▮▮▮▮▮▮▮

and others, knowingly and willfully conspired to distribute heroin, a Schedule I controlled

substance, fentanyl, a Schedule II controlled substance, cocaine, a Schedule II controlled

---

[1] I believe STEWART to be his real name, but one of the listed aliases could be his real name instead. I recently
reviewed a report from the National Crime Information Center (NCIC) database, which was produced on February
28, 2018. That report lists that Korey Stewart has utilized the alias of Corey Adams, Cory Adams, Corethious
Patrick Bryant, Korey Steward, and Korey C. Stewart. All of these names are listed as having the same identifiers,
however there are two dates of birth listed. I know, based on my training and experience, that NCIC is a database of

substance, and 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B).

    4.    In addition, I submit this affidavit in support of an application for a seizure warrant authorizing DEA to seize all accounts held at TD Bank in the names of: (1) ███████ ████████████████████████, who has a date of birth of October 23, 1986; (2) Korey Stewart, a/k/a Corey Adams, a/k/a Corethious Patrick Bryant, a/k/a Keith Young, who has used dates of birth of June 30, 1982, and January 5, 1989; including but not limited to account number 4310887778; as I have sufficient cause to believe that such currency is subject to forfeiture under: (a) 21 U.S.C. § 881(a)(6), as money furnished or intended to be furnished by a person in exchange for a controlled substance, proceeds traceable to such an exchange, and/or money used or intended to be used to facilitate a violation of the Controlled Substances Act, 21 U.S.C. §§ 801-971; and/or (b) 18 U.S.C. § 981(a)(1)(C), as proceeds derived from "specified unlawful activity," as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), namely the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance. For criminal forfeiture purposes, it is not necessary to show that the property to be seized and forfeited is traceable to the offense giving rise to the forfeiture. If the property has the same value as the property directly involved in the criminal offense, it may be forfeited as a substitute asset. *See* 21 U.S.C. § 853(p). Further, a seizure warrant authorizing the seizure of forfeitable property may be issued in this district, without regard to the location of the property. *See* 21 U.S.C. § 853(l).

---

arrest records that are correlated by fingerprints of the arrestee.

5.      I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by fellow law enforcement officers, and from reviewing information for a variety of additional sources, including confidential sources, cooperating witnesses, physical surveillance, and public records. This affidavit is intended to show that there is probable cause for the offenses charged, and does not set forth all of my knowledge about this matter.

BACKGROUND

6.      On September 15, 2016, I obtained a search warrant from the Honorable John M. Conroy, United States Magistrate Judge for the District of Vermont for location information of the cellular telephone assigned the number (917) 780-9282 which was believed to be utilized by STEWART. A copy of the Affidavit submitted in support of the application for the September 15, 2016 search warrant is attached as Exhibit 1, and incorporated herein by reference. The contents of Exhibit 1 remain true and correct.

7.      As outlined in Exhibit 1, law enforcement seized suspected heroin, cocaine, and cocaine base from Banfield's[2] residence on August 27, 2015. All of the substances have been submitted to the DEA laboratory for testing. The powder suspected to be cocaine was confirmed to be approximately 14 grams of cocaine hydrochloride. The suspected heroin was confirmed to be a mixture of heroin and fentanyl weighing approximately 34 grams. The suspected cocaine base has not yet been tested. Prior to its submission to the laboratory, the suspected cocaine base was field-tested, which resulted in a positive for the presence of cocaine. I personally observed the substance, and the substance has the appearance of cocaine base. In addition, I estimate the

---

[2] At the time of her arrest, Banfield was an opiate addict. Banfield has since been convicted of conspiracy to distribute heroin, having pleaded guilty with a cooperation plea agreement with the United States. Banfield received a time-served sentence, and is currently on federal supervised release.

weight of the substance to be in excess of 28 grams.

SEARCH OF SEIZED CELLPHONES

8.      On April 5, 2017, I obtained a search warrant for the cellphones seized from the encounter with Korey STEWART ████████████, and David Williams on August 27, 2015, which is discussed in detail in Exhibit 1.

9.      I have reviewed text messages, calls logs, and photographs obtained from a phone that was seized from STEWART and ████████████ There were multiple text messages from this phone to several Vermont phone numbers to include Stephanie Banfield.  Upon reviewing the text messages within the phone, it appeared that the possessor was using the phone to arrange narcotics transactions.  There was one text message sent to this phone who identified the possessor as "Skip."

10.      I have reviewed text messages, calls logs, and photographs obtained from a phone that, based on its contents, appeared to belong to David Williams. In this phone, I located photographs of David Williams with STEWART and Leander Hannibal.  Hannibal's conduct in regards to the conspiracy is outlined in Exhibit 1.

11.      I have reviewed text messages, calls logs, and photographs obtained from a phone that, based on its contents, appeared to belong to ████████████ Within ████████████ ████████ phone, she had photographs of the following:

- Western Union money orders with the name "Tartaro & Chiavelli".

- A note that has "TD ACCT 7916074086" written on it.

- A TD Bank receipt with the account number 4310887778.

5

- Multiple photos of Money Grams and Western Unions receipts.

- Large amounts of US currency.

- Korey STEWART possessing large amounts of US currency.

- A screenshot of a text messages with contact "Korey" with the phone number (347) 471-6656, referencing "TD Bank Account number 4785320379" and the name "Korey Stewart."

- A screenshot of a text message conversation from "Korey" where the messages "4311446143 td bank 1500" and "Account #4310877646 td bank 700 ruby Johnson" were sent.

- A photograph of STEWART with Leander Hannibal.

- A video of Stephanie Banfield's ex-boyfriend Keith McGregor. In the video, McGregor appeared to be under the influence of an unknown substance. A scale with a white powdery residue is visible on a table.

12.    I also located multiple text messages between a user of the ▓▓▓▓▓▓▓▓ phone and a contact with the contact "Korey." The ▓▓▓▓▓▓▓▓ phone had the following text messages with "Korey" on December 16, 2014:

Korey: "Can you put money in the bank for kyroe mom"

▓▓▓▓▓▓▓▓ "How much?"

Korey: "100 for now"

13.    I reviewed a conversation between the ▓▓▓▓▓▓▓▓ phone and the phone number (802) 557-4563 on December 24, 2014:

6

(802) 557-4563:  "come to cher wit some hard."

Based on my training and experience, I know that "hard" is a slang term for cocaine base.

14.     I reviewed a conversation between the  phone and the phone

number (802) 557-4563 on December 30, 2014:

"725 up"

"880 last of it"

(802) 557-4563: "grab the money"

"I was tryna tell u they tryna buy the last of the down so that he can
make punches to ppl"

"Gave 2490 bc said it's suppose to be 2550 but keith owed 60
outta it"

Based on my training and experience, I know that "up" is a slang term for cocaine or

cocaine base, "down" is a slang term for heroin, and that "punches" is a slang term for sales of

controlled substances.

15.     I reviewed a conversation between the [REDACTED] phone and the phone

number (802) 557-4563 on January 10, 2015:

(802) 557-4563 "Can you grab scale maybe"

"ok"

(802) 557-4563 "rubberbands"

Based on my training and experience, I know that a scale is frequently used by drug traffickers to

weigh drugs when packaging them for distribution.  I also know that rubber bands are frequently

used to secure the packaging of drugs.

16.    I reviewed a conversation between the ▮▮▮▮▮▮ phone and a contact in the phone "Korey Mi Amor" with the phone number (718) 374-2679 on April 18, 2015:

▮▮▮▮▮▮: "I got ur pills".

"Korey Mi Amor": "no more pills".

"Korey Mi Amor": "This nigga got 147 bricks for 6k"

"Korey Mi Amor" "I can sell em for $50 and still get a bunch of money."

17.    I reviewed a conversation between the ▮▮▮▮▮▮ phone and "Korey Mi Amor" on May 18, 2015:

▮▮▮▮▮▮ "last name?"

"Korey Mi Amor": "Bryant"

"Korey Mi Amor": "Corethious"

"Korey Mi Amor": "or my real name"

As discussed in Exhibit 1, STEWART provided a false identification in the name of Corethious Bryant during the August 27, 2015 encounter with DEA.

18.    I reviewed a conversation between the ▮▮▮▮▮▮ phone and "Korey Mi Amor" on July 4, 2015:

"Korey Mi Amor": "79 Susie Wilson."

As stated in Exhibit 1, 79 Susie Wilson Road in Essex was Banfield's address.

19.    I reviewed a conversation between the ▮▮▮▮▮▮ phone and "Korey Mi Amor" on July 31, 2015:

"Korey Mi Amor":"$2,150"

"Korey Mi Amor": "Money in td."

8

On July 31, 2015, a cash deposit of $2,150 was made into TD Bank Account 4310887778, which was opened in the name of ███████████

## RESULTS OF SEPTEMBER 15, 2016 SEARCH WARRANT

20.     After executing the search warrant on September 15, 2016, I began monitoring the location information. On September 18, 2016, the phone appeared to have traveled to the area of Portland, ME. The phone remained in the area of Portland, ME until September 22, 2016, when it appeared to be traveling toward Vermont. I and other investigators conducted surveillance in an attempt to locate the individual carrying the phone. While doing this, I saw a person who I recognized as STEWART from my work on this investigation, including my previous review of photographs of STEWART. When I first saw STEWART, he was a passenger in a red Dodge Durango, with Massachusetts license plates located in Chittenden County, Vermont. A woman, later identified as Nicole Osborne, was driving the red Dodge Durango. The vehicle's location was roughly consistent with the location information of the phone assigned (917) 780-9282. At this point in time, however, the location information was not precise.

21.     Agents saw the Red Dodge Durango drive to a particular known address in Chittenden County, Vermont. Based on toll analysis, I know that an associate of "Skip" resides in the area that the Red Dodge Durango was located. Investigators observed "Skip" and Osborne in the area of this residence for approximately 15 minutes. "Skip" and Osborne then departed the residence and began traveling southbound toward New Hampshire and southeast Maine.

22.     I coordinated with the New Hampshire State Police (NHSP) to stop the Dodge Durango. NHSP Troopers Frigon and Wilbur initiated the traffic stop on Interstate 93

9

southbound within the Town of Hooksett, New Hampshire. Surveillance and location information indicated that the vehicle driven by "Skip" and Osborne made only two stops during the trip from Chittenden County to New Hampshire: the first was a visit to the drive through of a fast food restaurant; the other was a stop at a rest area, at which the Red Dodge Durango was refueled.

23.      During the traffic stop, the male driver of the Durango provided law enforcement a Florida driver's license with the name Keith Young, Jr. NHSP obtained a photograph of this license and have subsequently provided me with a copy of it. I recognize the person depicted on the Florida license as STEWART. From the Florida Department of Motor Vehicles (FDMV), I subsequently obtained the official FDMV photograph of Keith Young, Jr. That photograph is does not depict STEWART.

24.      During Trooper Frigon's interview with Osborne, Osborne stated that she only knew the driver of the vehicle as "Slim." During Trooper Frigon's roadside interviews with STEWART and Osborne, both subjects gave conflicting accounts of the day's activities. STEWART consented to the search of his person, where $4,030 in US currency was located in a pocket of his pants. Trooper Frigon noticed that STEWART had two cell phones. STEWART provided the trooper the phone number (917) 780-9282 as one of his phone numbers. Osborne initially consented to the search of the vehicle, but later revoked her consent.

25.      NHSP Trooper Wilber's K9 partner was deployed to conduct an exterior sniff of the vehicle following Osborne's denial of a consent search on the vehicle. Trooper Wilber's K9 alerted to the odor of narcotics within the vehicle and the vehicle was seized. STEWART and Osborne were released pending future investigation.

26.    On September 23, 2016, Trooper Frigon applied for a New Hampshire state
search warrant for the Dodge Durango, and it was obtained and executed the same day. During
the search of the vehicle, $15,480.00 in US currency and approximately 8 suspected oxycodone
pills were located in a black backpack that contained male's clothing.  A baggie containing
suspected heroin was located in a yellow jacket that was in the driver side back seat. The
suspected heroin was subsequently sent to the DEA North East Regional Lab which determined it
to be heroin, and that it weighed 19.138 grams.

ADDITIONAL FINANCIAL INVESTIGATION

27.    On July 27, 2016, the United States Attorney's Office for the District of Vermont
requested and obtained tax records from the Internal Revenue Service for the names Corey
Adams and ▓▓▓▓▓▓▓▓▓▓  No tax records were on file for Corey Adams.  In the year
of 2013, ▓▓▓▓▓▓ claimed $9,386.00 in wages, salary, and tips and collected $10,032 in
unemployment compensation. In 2014, ▓▓▓▓▓▓▓ claimed $20,008.00 in wages, salary, and
tips and there were no tax records on file for ▓▓▓▓▓▓ in 2015.

28.    In Exhibit 1, I outlined the initial investigation of ▓▓▓▓▓▓▓▓▓▓
financial information, including the activity in ▓▓▓▓▓▓▓▓ TD Bank Account
numbered 4310887778.  As of January 2018, the TD Bank records showed that since the
4310887778 account was opened in March of 2015, over $170,000.00 worth of cash deposits
were made into ▓▓▓▓▓▓ bank account, with numerous deposits in Vermont and Maine.
Examination of deposit slips show substantial differences in handwriting, indicating numerous
people have made cash deposits.

11

29.     Video surveillance of some of these deposits into account numbered 4310887778 was obtained from TD Bank.  The video shows multiple different people making cash deposits, including an unidentified white male at the TD Bank branch in Winooski, Vermont.  Two videos from a TD Bank branch in Bangor Maine show STEWART making deposits of $2,500 into the ▆▆▆▆▆▆▆▆▆▆ account on January 6, 2017 and May 7, 2017.

30.     On January 11, 2018, the latest bank records were obtained for TD Bank account 4310887778, which remains in the name of ▆▆▆▆▆▆▆▆▆▆, showing activity through late December 2017.  The records reflect slightly less than $30,000 of cash deposits between August 2017 and December 2017.  Cash deposits include a $2,000 deposit on September 13, 2017 at the Winooski, Vermont TD Bank location, a $1,400 deposit on October 14, 2017 at the Winooski, Vermont TD Bank location, and a $2,500 deposit at a Portland, Maine TD Bank location.  Video footage for these deposits has been requested but not yet received.

31.     I examined the phone records for a phone number associated with STEWART. On May 7, 2017, STEWART's phone had three communications with phone number (207) 942-2288.  This is the phone number for the TD Bank branch in Bangor, Maine where STEWART made the $2,500 cash deposit on May 7, 2017.

ADDITIONAL PROFFER BY BANFIELD & COMMUNICATION WITH "SKIP"

32.     On February 8, 2017, I attended a second proffer with Stephanie Banfield to cover topics unrelated to this investigation. During the proffer, Banfield stated that she had been recently contacted by "Skip" multiple times via Facebook messenger. Banfield said that "Skip" had used the Facebook name "Kranky Kon" to contact her. Banfield was shown a Facebook account for "Kranky Kon," which Banfield confirmed was the same account who had contacted

12

her on Facebook messenger, and she believed it to be "Skip." As outlined in Exhibit 1, in September 2016, the "Kranky Kon" Facebook account was associated with the phone number 917-780-9282.

33. I have observed the Facebook account belonging to "Kranky Kon." The Facebook account name is "Skip.States." The Facebook account also "likes" the Facebook page "Skip States Entertainment." As outlined in Exhibit 1, Skip States Entertainment is an LLC that is associated with "Skip."

34. On February 10, 2017, DEA TFO Merchand and I met with Banfield for the purpose of placing a voice call to "Skip" through Facebook messenger. There was no answer, but Banfield received an incoming video call from the account name of "Kranky Kon" shortly thereafter. Banfield was unable to speak with "Skip" by using video function of Facebook messenger. Banfield then sent "Skip" a Facebook message asking him for his phone number. "Skip" proceeded to ask for her number, which Banfield provided. That same day, Banfield received two phone calls from the phone number (802) 503-0483, which I recorded. Banfield identified the voice that she spoke to as the voice of "Skip."

35. During those phone calls, Banfield and "Skip" talked about her arrest that occurred in August of 2015. Banfield told "Skip" that she was going to be sentenced for all of the drugs seized from her apartment. "Skip" asked Banfield how "they" knew where she lived. Banfield told him that "Cody" must of told them. "Skip" said that it could have happened earlier, and asked about a subject named "Rusty."

36. On March 1, 2017, TFO Merchand and I again met with Banfield. During our meeting with Banfield, she attempted to contact "Skip" by using the Facebook messenger

13

application and calling the number (802) 503-0483. Banfield was initially unable to contact "Skip." TFO Merchand and I departed, but were later notified by Banfield that "Skip" had sent her a Facebook messenger message. TFO Merchand and I met with Banfield again that day, and Banfield used Facebook Messenger to call the Facebook account of "Kranky Kon." I recorded the conversation between Banfield and the person she identified as "Skip."

37.      During the call, Banfield asked "Skip" for money. "Skip" said that he was not "up there" and that he had no reason to be "up there." "Skip" said that he did not have any one up there. Banfield told "Skip" that she could have told Law Enforcement that all of the "shit" in her residence was his. "Skip" said that "they" did not find that "shit." "Skip" requested that Banfield show him some "paperwork." "Skip" said that Banfield, "Keith" or "JR" took her "shit." Banfield then told "Skip" that he had been at her residence and that she thought he had been arrested. "Skip" denied being at Banfield residence, denied being arrested, and then asked Banfield if she knew who she was talking to.

## SEARCH WARRANT FOR "KRANKY KON" FACEBOOK ACCOUNT

38.      I subsequently obtained a federal search warrant for the "Kranky Kon" Facebook account, and served it on Facebook on April 5, 2017. Data and content associated with the Facebook account www.facebook.com/skip.states with the user name of "Kranky Kon" was subsequently received from Facebook. I have reviewed these materials.

39.      The user of the "Kranky Kon" account conducted searches of the following on Facebook: Rajharsha Narayanswamy, Garth Olsen, ▉▉▉▉▉, Maine Drug Enforcement Agency, and Skip States Entertainment. Narayanswamy and Olsen Ross have all been identified as co-conspirators in this case; ▉▉▉▉▉ is an LLC associated with the co-conspirator ▉▉▉▉▉

████████████████ and Skip States Entertainment is a LLC associated with the name Korey

STEWART. In addition, the user of the "Kranky Kon" account sent messages on the Facebook

account where he identified himself as "Gutta" and "Slim." Both "Gutta" and "Slim" are known

to be additional aliases for "Skip." As such, I will refer to the user of the "Kranky Kon" account

as "Skip."

     40.     On September 1, 2016, "Skip" sent a Facebook message to "Krystal Lavellee"

"they like percs?" I know from my training and experience that "percs" is an abbreviation for

Percocet, a brand name for the prescription opiate Oxycodone. As outlined above, the September

22, 2016 stop resulted in the seizure of Oxycodone pills. "Skip" also subsequently sent to

Lavellee via Facebook Messenger a picture of a receipt that he had for the seizure of the US

currency and narcotics seized on September 22, 2016.

     41.     On September 26, 2016, "Skip" sent a Facebook message to Facebook account

"Farryn Ellwood": "Police took 19k from me when I left." "Skip" then sent a picture of the

receipt of the seized US currency that occurred on September 22, 2016. On October 15, 2016,

Ellwood asked "Skip": "Where u get Corey from" and "So it's not Corey Adams? Or skip?" On

February 11, 2017, "Skip" sent Facebook messages to Ellwood: "If i was in vt" "U gonna keep

me safe if i cum?" Ellwood replied "Safe?" and "U got ppl after u lol?" "Skip" responded "yea

the snitches."

DEBRIEF OF CS

     42.     On December 11, 2017, DEA SA Timothy Hoffmann and I met with CS.[3] CS

stated it knew a man who used the alias "Skip," and knew "Skip" to sell narcotics in both Maine

---

3 The CS has a misdemeanor convictions for Reckless Endangerment in 2012, Disorderly Conduct in 2011,

and Vermont. CS knew "Skip" to gamble large amounts of money. CS stated that it knew

"Skip" to use a TD Bank account in the name of "███████" with transactions occurring at the TD

Bank branch in Winooski, Vermont. CS provided the TD Bank account number as 4310887778.

CS also stated that "Skip" was associated with a heavy-set white female who resided on West

Street in Winooski, Vermont.

43.     On January 4, 2018, SA Hoffman and I again met with CS. CS stated it had just

spoken to "Skip" the prior weekend, learning that "Skip" had recently brought up drugs to

Vermont but they were "garbage." CS stated that "Skip" had been dealing drugs in Vermont

since approximately 2012, and that law enforcement activity had spooked him on occasion,

causing him to leave the area. On one occasion, when law enforcement activity occurred in both

Vermont and Maine, "Skip" traveled to California. CS stated it had purchased drugs from

"Skip" in the past. During this meeting, CS provided two phone numbers for "Skip": (917) 977-

1381 (the TARGET TELEPHONE) and 207-523-9829.

<u>WIRE INTERCEPTS</u>

44.     On February 16, 2018, United States Circuit Judge Peter Hall authorized the

interception of wire and electronic communication and a search warrant for location information

of the phone number the TARGET TELEPHONE, which was believed to be utilized STEWART

based on analysis of toll records for ███████████████ and others, as well as the statements of

---

Disorderly Conduct in 1999, False Information to Law Enforcement 1998, Disorderly Conduct in 1998, and multiple
probation violations. The CS has felony convictions for Possession with the Intent to Distribute Heroin in 1997,
Conspiracy to Distribute Cocaine in 1999, Possession with the Intent to Distribute Heroin in 2000, and Cocaine
Possession in 2007. CS was assisting DEA in exchange for monetary compensation. CS was assisting DEA from
approximately December 2017 to January 8, 2017. Information provided by CS was considered reliable, as it was
corroborated from various sources. During a controlled purchase in January 2018, CS attempted to keep multiple
pieces of cocaine base by secreting them in his sock shortly after the controlled purchase. I do not believe this
conduct effects the reliability of CS's information, in part because CS admitted to the conduct when confronted.

CS outlined above.

45.     Members of the Burlington RO first received the interception of wire and electronic communication of the TARGET TELEPHONE on February 17, 2018. I have listened to intercepted communications over the TARGET TELEPHONE, and, based on prior controlled calls made during the investigation, recognize the voice to be that of a person witnesses identified as "Skip," who has been identified as STEWART. Initial intercepts and location information indicated that STEWART was in the area of Bangor, Maine, and there were multiple intercepts that indicated that STEWART was facilitating the distribution of scheduled narcotics in Bangor and other locations in Maine.

46.     On February 22, 2018, the TARGET TELEPHONE received a phone call from the phone number (347) 968-0318. A search of this phone number through Facebook revealed that it was associated with a Facebook account in the name of ▮▮▮▮▮▮ an aka for ▮▮▮▮▮▮ ▮▮▮▮▮▮. I recognize the person in photographs on the ▮▮▮▮▮ Facebook account to be the same ▮▮▮▮▮▮▮ encountered by the DEA on August 27, 2015. In addition, rental records indicate that ▮▮▮▮▮▮ is renting an apartment located at the Abbey Woods Subdivision with an address at 22 Abbey Lane, Apartment #2410, Danbury, CT. Additionally, a grand jury subpoena to Bank of America revealed that Korey STEWART had a bank account with the listed address of 22 Abbey Lane, Apartment #2410. During the phone call, ▮▮▮▮▮▮ and STEWART had the following conversations.

STEWART:   Hello.

▮▮▮▮▮▮   Yes.

STEWART:   Yes, sorry. Did you get peek inside that thing for me, the bucket?

17

██████████████ : Oh no I didn't, I just finished making a bottle. Hold on. [Voice Overlap]

STEWART:    Oh...

██████████████ : No.

STEWART:    Okay. Yeah, I put it there. I was just making sure. [Voice Overlap]

██████████████ I pack it, I pack it all up.

STEWART:    You what?

██████████████ : I had pack it all up, remember?

STEWART:    No, no... Yeah no, no I'm talking about... [Voice Overlap]

██████████████ : Huh?

STEWART:    Yeah, no I was talking about after that.

██████████████ : No whatever was in here, that's where it went.

STEWART:    Yeah, I know but I was home after that but yeah no yeah it ain't nothing in there. Yeah I took it down to that house or whatever [U/I]

██████████████ : [Aside: Sit down, sit down.]

STEWART:    Alright, thank, thank you.

██████████████ : Yeah. [Child crying in the background]

47.    Approximately 24 minutes later on that same day, the TARGET TELEPHONE made an outgoing call to Amber ██████████████

STEWART:    [Aside: I'll call her. Alright, I got you.]

██████████████ : Hello.

STEWART:    Yeah, what's the uhm... The name of that, what brand is that? That book bag that I have bought from Dick's. You know the brand? [Voice Overlap]

18

�â–ˆ : Where is it?

STEWART:    I, I don't, I don't have it with me and shit. You know I got that Pistol and all that shit in it so... You remember the name of that shit?

▢ : I'm gonna, I'm gonna look through my scroll my screen shots. [Voice Overlap]

STEWART:    I think is field, field and stream I think, field and stream I think so. Alright, alright, alright thanks.

▢ : You hear me?

STEWART:    I said yeah, thank you. Sorry about that.

▢ I just said I was scrolling through my... [Voice Overlap]

STEWART:    Oh yeah, yeah is in there, it might be in there, yeah it might be... Aright cool but uhm text me if you come across it.

▢ : Oh you are not going to wait on the phone with me [U/I] [Voice Overlap]

STEWART:    Oh yeah if is a fast thing but no I just, I, you know I ain't even gonna call and bother you with this shit but you know... He asked me about some Dick's shit so that' s why I...

UNKNOWN MALE: [Background: [U/I]]

STEWART:    [Aside: Huh?]

▢ Alright, no problem.

STEWART:    [Aside: Where in Dicks?]

UNKNOWN MALE: [Background: [U/I]]

▢ : No problem, I'm just scrolling back.

UNKNOWN MALE: [Background: [U/I]]

STEWART:    [Aside: Oh yeah? No I even see that, I been in this Dicks before. I ain't

even seem that shit.]

 : [Sigh] Uhm...

STEWART:   He said he was uh... [U/I] said he was gonna do that I don't know. But I
know he probably did.

 : So...

STEWART:   He just, I know, I know... You know what [U/I] said so [U/I] even [U/I]...

 : What was that?

STEWART:   I said he didn't get back to me so I already know what was said, cause I
know what I seen with him. The Field and stream I think that shit is man. I'm
almost or was that the other one? Man I don't know. Let me look on my phone and
fuck it, I'ma look it up. [U/I] [Voice Overlap]

 : Alright. [Voice Overlap]

STEWART:   Alright.

It appeared that during these intercepts of these phone communications, STEWART was asking

for [redacted] assistance in locating and identifying a back pack that contained a

firearm.

48.      Members of the Burlington RO continued to monitor the location information and

the wire and electronic communications of the TARGET TELEPHONE, which indicated that

STEWART traveled south from Bangor, Maine to Danbury, Connecticut on February 24, 2018.

The GPS location information from the TARGET TELEPHONE indicated that he arrived back

in the Abbey Woods Subdivision that same day.

49.      On February 25, 2018, intercepts indicated that STEWART was arranging to

purchase narcotics from an unidentified male who utilized the following phone number (929)

308-6044. Subsequent interceptions revealed that STEWART was going to utilize a female, later

identified as Jessica Molina, to pick up and transport heroin and crack cocaine from New York to

an undisclosed location. Specifically, STEWART utilized the TARGET TELEPHONE to

communication with phone number (718) 216-5076. A search of Facebook revealed that this

number was associated with Molina. Further, subscriber information for (718) 216-5076 states

that the number is subscribed by a Jessica Molina. STEWART's communications on the evening

of February 25, 2018 revealed that STEWART arranged for Molina to meet with a source of

supply in the Bronx, New York. During one intercepted communication, an unknown male uses

Molina's cellular telephone to ask STEWART "up and down, right?" I know from my training

an experience that "up" is slang for cocaine or cocaine base, and "down" is slang for heroin.

50.     It should be noted that location information indicated that the TARGET

TELEPHONE traveled from the Abbey Woods subdivision to the New York City area during the

evening of February 25, 2018. At approximately 2:58 AM on February 26, 2018 GPS location

information from the TARGET TELEPHONE revealed that it returned to the area of the Abbey

Woods Subdivision.

51.     On February 26, 2018, members of the Danbury Police Department and Special

Agent John Gray from the DEA Bridgeport CT, office conducted surveillance of 22 Abbey Lane

where they observed STEWART exit the apartment building. It should be noted that during the

course of the interception of wire and electronic communication of the TARGET TELEPHONE,

would often receive text message notifications from Xfinity anytime the door to his residence

(presumably 22 Abbey Lane, Apartment 1410) was opened. On February 26, 2018, SA

Hoffmann relayed to Special Agent John Gray, that the TARGET TELEPHONE just received a

21

message that the door to the residence had been opened. Within one or two minutes later, surveillance observed STEWART exiting the apartment building to 22 Abbey Lane.

52.     On February 27, 2018, the TARGET TELEPHONE called Molina. During the phone call, Molina indicated that that her vehicle had broken down in Wallingford Connecticut near the Ola's restaurant. Shortly after, the TARGET TELEPHONE contacted an unidentified male with the phone number (347) 641-5720. During that call, STEWART talked about how Molina's vehicle was broken down, and that she was on "her way there. With a little you know 30 and 40".

53.     Based on these intercepted communications, this information was relayed to the Wallingford Connecticut Police Department. Wallingford Police Department Police Officers Brangi (accompanied by his K9 Tate) and Officer Stolfi approached a Chrysler 300 which was broken down at the Ola's restaurant located at 722 N Colony Road, in Wallingford, CT.  A tow truck was present when the officers arrived. Upon Officer Brangi's approach to the vehicles, Molina was seated within the tow truck.

54.     Officer Brangi was advised by the tow truck driver that Molina was the sole occupant of the vehicle. Officer Brandi utilized K9 Tate to conduct free-air sniff of Molina's vehicle, and K9 Tate alerted to the presence of narcotics. Officer Brangi spoke to spoke to Molina, and Molina stated that she was headed to Maine, denied having any narcotics, and consented to the search of her vehicle. Officer Brangi also spoke to the tow truck driver, who also consented to the search of the tow truck that Molina had been sitting in. Both searches of Molina's vehicle and the tow truck did not reveal any narcotics. Molina then consented to the search of her person.

55. Officer Michonski (a female officer) arrived to conduct the search of Molina. The officers were still on North Colony Road (a road with heavy traffic), so Officer Michonski escorted Molina to an interior portion of the auto shop. A search of Molina's jacket and purse was negative for any contraband. Officer Stolfi continued to search through Molina's other belongings, including a tied-off white plastic bag. When Officer Stolfi opened it, he located a brown paper bag. Inside the brown paper bag he found an open bag of Doritos, a ½ eaten burrito and a tied off condom containing what he suspected from his training and experience to be narcotics. Officer Brangi opened the condom and un-wrapped several sandwich size baggies. One contained a grayish powder substance, and the other a white rock-like substance which the officers recognized as heroin and cocaine base. Molina was placed in handcuffs and seated in the rear of Officer Michonski's cruiser. Molina became defensive stating the items weren't hers and that she had never seen them before.

56. A field test was conducted on the suspected cocaine base, which tested positive and weighed approximately 44.4 grams. A field test was conducted on the suspected heroin, which tested positive and weighed approximately 31.5 grams.

57. Officer Michonski transported Molina to the Wallingford Police Department and processed her for the Possession with intent to sell (two counts) and Possession of narcotics (two counts). Wallingford PD Sgt. James Cifarelli read Molina Miranda warnings and subsequently conducted an interview which was audio and video recorded at headquarters. In the interview, Molina told Sgt. Cifarelli she needed money and admitted to transporting the drugs from New York, and that she was en-route to drop them off in Maine before her car broke down.

58.     Molina also consented to the search of her cellphone. I have seen photographs of text messages from this cellphone. Molina had multiple text messages with the TARGET TELEPHONE which was stored with the contact name "Boss Man." On February 8, 2018, the TARGET TELEPHONE sent a photograph of a TD Bank receipt with the account number 4310887778. This is same account number that belonged to TD Bank account of Amber ███████████████ which had previously been used to deposit the proceeds of drug transactions.

### ADDITIONAL INTERCEPTED COMMUNICATIONS

59.     On March 1, 2018, STEWART contacted an Uber driver. During that intercept, the Uber driver indicated that he was outside of 22 Abbey Lane. Following this, GPS location information and wire and electronic intercepts indicate that STEWART then traveled to Portland, Maine and then back to Bangor, Maine.

60.     On March 8, 2018, STEWART was intercepted using the TARGET TELEPHONE to contact the TD Bank branch in Bangor, Maine to inquire as to their hours of operation.

### CONCLUSION

61.     Based on the information outlined above, I believe there is probable cause to believe that from in or about August 2015 to in or about March 2018, Korey STEWART,  aka Corey Adams, aka Corethious Bryant, aka Keith Young, aka Steven Allen, aka "Skip," aka "Gutta," aka "Slim," aka "Dash," ███████████████ and others, knowingly and willfully conspired to distribute heroin, a Schedule I controlled substance, fentanyl, a Schedule II controlled substance, cocaine, a Schedule II controlled substance, and 28 grams or more of a

mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled

substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B).

62.     In addition, based on the foregoing, I believe there is probable cause to believe

that the funds at TD Bank in the names of: (1) ████████████ ████████████, who

has a date of birth of October 23, 1986; (2) Korey Stewart, a/k/a Corey Adams, a/k/a Corethious

Patrick Bryant, a/k/a Keith Young, who has used dates of birth of June 30, 1982, and January 5,

1989; including but not limited to account number 4310887778, constitute the direct or indirect

proceeds of illicit transactions involving controlled substances, or were used or intended to be

used to facilitate such illicit transactions in violation of the Controlled Substances Act, and

therefore, such funds are forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6) and 18

U.S.C. § 981(a)(1)(C), and in accordance with 18 U.S.C. § 983.

Dated at Burlington, Vermont, this ___7th___ day of March, 2018.

_____

MARK PERSSON
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this ___9th___ day of March, 2018.

_____

HONORABLE JOHN M. CONROY
United States Magistrate Judge

25