# AFFIDAVIT

I, Mark Persson, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been since September 2014. Prior to working at the DEA, I was employed by the Stafford County (Virginia) Sheriff's Office since October 2007 in various law enforcement positions, most recently as a Detective. I am currently assigned to the Burlington, Vermont Resident Office. I have participated in investigations relating to possession, distribution and manufacturing of controlled substances, including crack cocaine and heroin. I have also conducted and/or participated in surveillances, the execution of search warrants, debriefings of informants, and reviews of recorded conversations. Through my training, education and experience, I have become familiar with the manner and methods of illegal narcotics distribution.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of cellular telephone number cellular telephone assigned call number 917-780-9282 (the TARGET CELL PHONE). Law enforcement has obtained records associated with the TARGET CELL PHONE from T-MOBILE. According to the company, there is no subscriber information for the number. In addition, T-MOBILE advised the number was activated on August 28, 2015.

3. The TARGET CELL PHONE and property to be searched are described herein and in Attachment A, and the location information, both historical and prospective, and corresponding call detail records to be seized are described herein and in Attachment B.

4. Based on the facts set forth in this affidavit, I respectfully submit there is probable cause to believe that the user of TARGET CELL PHONE and others have committed, are committing, and will continue to commit violations of federal law; specifically, the distribution of and conspiracy to distribute heroin, and the use of a communication facility to commit, cause and facilitate that distribution and conspiracy, in violation of 21 U.S.C. §§ 841(a), 843(b), and 846; and that there is probable cause to believe the TARGET CELL PHONE has been used and will continue to be used as a tool in committing these crimes. There is also probable cause to believe the location information for the TARGET CELL PHONE described in Attachment B will lead to evidence of such crimes, fruits of such crimes, and property used to commit such crimes, within the meaning of Federal Rule of Criminal Procedure 41(c)(1),(2), and (3).

5. Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation. This affidavit is based upon my training and experience, my own investigation, and the investigation of other law enforcement officers.

## I. Background

6. The DEA Burlington Resident Office (RO) and other drug law enforcement agencies in Vermont have an ongoing investigation into possible violations of the Controlled Substances Act by a Corey ADAMS, aka "Skip," aka "Corethious BRYANT," aka "Korey STEWART" in the District of Vermont and elsewhere.

## II. Information from Tina FRANCIS

7. On March 19, 2015, Tina FRANCIS was arrested for her role in another DEA investigation. During post-arrest interviews and proffers, FRANCIS spoke extensively about her involvement with a heroin trafficker whom she only knew as "Skip" and individuals that worked for "Skip."

8. According to FRANCIS, she used "Skip" as a source for heroin and cocaine. FRANCIS said that "Skip" had been in the Burlington area distributing narcotics since approximately 2012. FRANCIS further detailed how "Skip" would employ runners to distribute the heroin in Burlington and also knew of a female in Essex, Vermont who had been a runner for "Skip."

9. FRANCIS was shown a photograph of Corey ADAMS who she positively identified as "Skip."

10. FRANCIS has since pled guilty to a charge that she violated the Controlled Substances Act, pursuant to a co-operation plea agreement with the United States. U.S. District Court Judge Geoffrey W. Crawford sentenced FRANCIS to a period of time served followed by three years of supervised release for this offense.

11. FRANCIS is a long-term opiate addict.

## III. Information from Ian JASMIN

12. In March 2015, Ian JASMIN was charged in the District of Vermont with violating the Controlled Substances Act.

13. In May of 2015, JASMIN met with law enforcement pursuant to a proffer agreement with the U.S. Attorney's Office. JASMIN stated that he was supplied heroin by "Skip" beginning in January 2014. JASMIN stated that he knew "Skip's" real name to be Corey ADAMS.

14. JASMIN has been indicted for violating the Controlled Substances Act and for firearms offenses and his case is pending trial. JASMIN's criminal record includes a felony conviction for burglary in the State of New York.

## IV. Information from Stephanie BANFIELD

15. In August 2015, while conducting surveillance DEA agents saw a Stephanie BANFIELD engage in drug distribution activity with a Cody SARGENT in Colchester, Vermont.

16. That same day, law enforcement confronted both BANFIELD and SARGENT and recovered heroin from SARGENT the passenger in his vehicle.

17. BANFIELD admitted to law enforcement that she sold heroin and identified a "Skip" and his partner, "T" as sources of supply. Furthermore, BANFIELD advised that she had been selling large amounts of heroin on regular basis for "Skip" and "T" and that there was a large amount or crack cocaine at her residence in Essex, Vermont.

18. As noted above, FRANCIS told law enforcement that one of Skip's runners was a woman in Essex, Vermont.

19. BANFIELD also said that she had deposited drug proceeds into a TD Bank account on behalf of "Skip." BANFIELD said that "Skip" directed her to make the cash deposits into a bank account belonging to a subject whose name BANFIELD recalled as "[redacted]." BANFIELD said that one of the TD bank receipts for a cash deposit was located at her residence in Essex.

20. BANFIELD advised that "Skip" and "T" would occasionally just arrive at her residence unannounced and the last time she had seen them "T" was driving a white colored Volvo sedan with license plates from out of state and was missing a front license plate.

21. BANFIELD provided agents consent to search her residence to recover the crack cocaine that she reportedly had.

22. On the same day in August 2015, DEA searched BANFIELD's Essex residence. They found crack cocaine and heroin at her residence. Agents also found $2323.00 in cash.

23. Law enforcement also found a July 2, 2015 TD Bank deposit for $8,460.00 at BANFIELD's residence.

24. BANFIELD is a long term opiate addict. In 2016, BANFIELD was charged in the District of Vermont with violating the Controlled Substances Act. She has since pled guilty and is awaiting sentencing. Since being charged, BANFIELD has violated her conditions of release by using controlled substances.

## V. Corey ADAMS' Arrival at BANFIELD's Residence

25. While agents were conducting the search of BANFIELD'S residence, two vehicles arrived at the residence at approximately the same time. Law enforcement agents confronted the vehicles' occupants.

26. The first vehicle to arrive was a white colored 2002 Volvo with Florida license plates arrived at BANFIELD's residence. The car was driven by an African-American male, who was alone in the car. The driver identified himself to law enforcement by providing New York driver license bearing his photograph with the name a David WILLIAMS.

27. As noted above, BANFIELD had previously told law enforcement that the last time BANFIELD had seen "T" he was driving a white colored Volvo.

28. The second vehicle was a 2012 Nissan Maxima with Connecticut license plates. This second car was driven by an African-American female and had an African-American male passenger. The woman identified herself to law enforcement by providing a Connecticut driver's license bearing her photograph with the name [redacted] [redacted]

29. As noted above, BANFIELD told law enforcement that she deposited drug proceeds for Skip into a bank account belonging to a woman named [redacted]

30. The male passenger of the Nissan identified himself to law enforcement by providing a New York photo identification bearing his photograph with the name Corethious BRYANT.

31. At the time of his encounter with DEA, law enforcement took a photograph of the man who identified himself as Corethious BRYANT.

32. I compared a New York Department of Motor Vehicles photograph of Corethious BRYANT to the photo DEA took of the man encountered on August 27, 2015 and determined that the man DEA encountered on August 27, 2015 was not BRYANT.

33. Investigators submitted the fingerprints of the man DEA encountered on August 27, 2015. Law enforcement received an alert from the FBI who advised that the fingerprints of the subject claiming to be Corethious BRYANT had been arrested under the names Corey ADAMS and Korey STEWART.

34. I compared the two arrest photos of Corey ADAMS to the photo DEA took of the man encountered on August 27, 2015 and confirmed that the man DEA encountered on August 27, 2015 was the same man who had previously arrested under the name Corey ADAMS.

35. Corey ADAMS was also the same name that Ian JASMIN identified as being "Skip." Corey ADAMS does not have a New York driver license on file.

36. I also viewed a Department of Motor Vehicle photo of Korey STEWART and it was the same person as the man DEA encountered on August 27, 2015 who had falsely claimed to have been Corethious BRYANT. A subject identified as Korey STEWART has also been arrested, but I was unable to locate any booking photos associated with the Korey STEWART arrests.

37. During her interaction with law enforcement that day, BANFIELD provided a phone number that BANFIELD stated was used by "Skip" and "T." I called that number and,

when I did so, one of the cellular telephones that WILLIAMS possessed indicated an incoming call.

38. Investigators took photographs of WILLIAMS and BRYANT and showed them to BANFIELD, who identified WILLIAMS as "T" and the male passenger in the Nissan as "Skip."

39. Agents searched the Nissan and the Volvo and found approximately $3,336.00 in cash, Western Union receipts, and Money Grams receipts. In the Nissan, agents found a TD Bank receipt for a $4,000.00 deposit. Both the TD Bank receipt found in BANFIELD'S residence and the TD Bank receipt found in [redacted] vehicle had the same last four digits for the account number.

40. No narcotics were located in the vehicles or on WILLIAMS, ADAMS, or [redacted] [redacted]

41. WILLIAMS and ADAMS were interviewed by TFO Merchand and SA Hope, but both WILLIAMS and ADAMS requested to speak with a lawyer before their questioning and the interviews were terminated. TFO Estes and RAC Villella conducted an interview with [redacted]. [redacted] admitted to being at BANFIELD'S residence in the past. [redacted] claimed that she was starting up a job as a spiritual leader, but admitted that she only had two or three customers in that field in Vermont. All three were permitted to leave.

42. On June 3, 2016, I attended a proffer with Stephanie BANFIELD at the US Attorney's Office. In the proffer, BANFIELD described her involvement with "Skip". BANFIELD said that she had been supplied with heroin by "Skip" since 2013. BANFIELD said that at first she would purchase heroin from "Skip" directly, but in 2014 "Skip" began to utilize runners.

43. BANFIELD said that she would call "Skip's" phone number to order heroin, but a "runner" would come out to conduct the hand to hand transactions. BANFIELD said that "Skip" was constantly changing his phone numbers and utilizing different runners to distribute heroin.

44. BANFIELD stated that she was a runner for "Skip" in April or May of 2015. BANFIELD said that "Raj" was "Skip's" runner before her. BANFIELD described an instance where "Skip" had delivered narcotics to her. After "Skip's" delivery, BANFIELD said that "Skip" called her and gave her instructions on whom to supply the narcotics to. BANFIELD said that both "Skip" and "T" would use the same phone number to coordinate drug transactions. BANFIELD said that "Skip" would pay her approximately 10% of the daily profit for running for "Skip". BANFIELD said that she would typically be paid in narcotics and that "Skip" typically made three thousand dollars a day from the drug transactions.

45. BANFIELD stated that "T" instructed her to deposit the proceeds of drug transactions into a TD Bank account.

46. BANFIELD said that she knew "Skip" had a business associated with him. BANFIELD said that she knew "Skip" to own the business "Skip States Entertainment". BANFIELD stated that "Skip" hosted an event at a club that was across the street from the DMV in South Burlington. BANFIELD said that she attended the event at the club where she met with "Skip" and "Raj."

47. Within days of this proffer, BANFIELD violated her conditions of release by using controlled substances and was arrested pursuant to federal warrant.

**VI. Investigation of [REDACTED] Bank Account**

48. Law enforcement has obtained records pertaining to the TD Bank account belonging to [REDACTED] that is discussed above. I have reviewed these records.

49. The records show that since the account was opened in March of 2015 over $104,000.00 worth of cash deposits were made into [REDACTED] bank account.

50. I obtained video footage of some of the cash deposits made into [REDACTED] bank account. In reviewing the footage, I observed Stephanie BANFIELD making cash deposits on July 2, 2015 for $8,460.00 in Essex Junction, Vermont and $3,500.00 on June 23, 2015 in Essex Junction, Vermont. The July 2, 2015 transaction is consistent with the receipt found in BANFIELD'S apartment and corroborates what BANFIELD has told law enforcement.

51. I observed a subject I identified as Garth OLSEN make cash deposits on June 15, 2015 for $2,605.00 in Burlington, Vermont, July 23, 2015 for $3,500.00 in Burlington, Vermont, July 29, 2015 for $6,500.00 in Burlington, Vermont, and July 31, 2015 for $2,150.00 in Burlington, Vermont.

52. I observed a subject who would later become a source of information (SOI#1) making deposits on July 30, 2015 for $3,920.00 in Burlington, Vermont and August 5, 2015 for $8,605.00 in Burlington, Vermont. The source of information will herein be referred to as SOI#1 for the remainder of the affidavit.

53. I identified [REDACTED] making cash deposit on July 16, 2015 for $4,500.00 in Winooski, Vermont and August 17, 2015 for $4,000.00 in Burlington, Vermont. The August 17, 2015 transaction is consistent with the receipt that was found in her vehicle on August 27, 2015.

54. Law enforcement has obtained records for other bank accounts in [REDACTED] name. She and a Korey STEWART share a Bank of America account. As previously explained Korey STEWART is a known alias for Corey ADAMS, aka "Skip".

55. WILLIAM-EASON and STEWART also are card holders for the Bank of America account belonging to "Skip States" LLC. I have been able to locate a website at www.skipstatesentertainment.com that is associated claims to be operated by "Skip States" LLC which appear to be bus entertainment business. Skip States Entertainment is the same name that BANFIELD provided for the business associated with "Skip."

## VII. Information from Rajharsha NARAYANSWAMY

56. On October 19, 2015, members of the Burlington RO conducted a controlled buy of heroin from Rajharsha NARAYANSWAMY. The heroin purchased on October 19, 2015 was believed to be from source different from "Skip".

57. In December of 2015, TFO Merchand and I interviewed NARAYANSWAMY at the Williston Police Department. In essence, NARAYANSWAMY admitted that he had dealt heroin for a "Skip" in 2015 in the Burlington area.

58. NARAYANSWAMY identified several Vermont residents who had participated in "Skip's" drug distribution business, including a "Cody" (believed to be Cody SARGENT), "Garth" (believed to be Garth OLSEN), and "Schuyler" (believed to be Schuyler HUVA).

59. Among other things, NARAYANSWAMY admitted that he had deposited drug distribution proceeds for Skip into TD bank account.

60. NARAYANSWAMY has been indicted for violating the Controlled Substances Act and has pled guilty to this offense. His case is pending sentencing.

61. On May 27, 2016, I attended a proffer with Rajharsha NARAYANSWAMY at the Essex County Jail in Lewis, New York. In the proffer, NARAYANSWAMY further described his involvement with "Skip".

62. NARAYANSWAMY said that in mid-year 2015 he was a runner for "Skip" for approximately three or four months. NARAYANSWAMY said that "Skip" initially would physically be at his residence to watch over the narcotic package. NARYANSWAMY said that a subject named "T" who was associated with "Skip" would also come to his residence to oversee the drug transactions. NARAYANSWAMY said that when "Skip" or "T" was at his residence he would sell about 20 to 30 buns a day.

63. NARAYANSWAMY stated that he would get paid in cash, heroin, or crack for running for "Skip". NARAYANSWAMY stated that he received either $100 or one to two buns of heroin. On top of the heroin/cash, NARAYANSWAMY stated that he would also receive small amounts of crack. NARAYANSWAMY stated that "Skip" would pay the runners 10% of the profit made that day. As previously stated, this was same percentage that BANFIELD claimed "Skip" had paid her. NARAYANSWAMY said that he

typically got paid two buns of heroin a day. NARAYANSWAMY stated that when "Skip" or his associates were out of town, "Skip" would shut off Skip's phone.

64. NARAYANSWAMY is long term opiate addict.

## VIII. Controlled buy from Schuyler HUVA on November 16, 2015

65. On November 16, 2015, members of the Burlington RO conducted a controlled purchase of heroin from Schuyler HUVA. The heroin was believed to be purchased from a source other than "Skip". Despite this, HUVA was heard through the transmitter talking about "Skip" and another subject named "Raj". HUVA talked about how "Raj" purchased an Audi vehicle for "Skip". HUVA also discussed how he had been given crack cocaine from "Skip". HUVA stated that he was supposed to sell on his "Skip's" behalf, but that he consumed it all, before he could sell it all.

66. HUVA's criminal record includes a 2002 felony conviction in the U.S. District Court for the District of Vermont for violating the Controlled Substances Act. HUVA is known to law enforcement as a user of controlled substances.

## IX. Information from a Winooski Police Department CI

67. On April 5, 2016, TFO Dan Merchand and I interviewed a Winooski Police Department Confidential Informant (CI). This subject was registered as a Confidential Informant with the Winooski Police Department and will be referred to as "Winooski PD CI". A criminal record check of Winooski PD CI revealed one previous misdemeanor conviction for Possession of Marijuana. Law enforcement possessed evidence indicating that the Winooski PD CI had violated federal and state drug laws and this fact was conveyed to Winooski PD CI, who was cooperating with law enforcement in hopes of receiving future consideration on such charges. The Winooski PD CI was advised no promises or predictions could be made in relation to its cooperation, but Winooski PD CI's cooperation would be relayed to prosecutors and Winooski PD CI agreed to cooperate with law enforcement.

68. The Winooski PD CI said that it had been a customer and runner for "Skip". The Winooski PD CI identified subjects named "Garth", "Raj", "Stephanie", and "Cody" as runners for "Skip."

69. The Winooski PD CI also provided the first name of SOI#1 discussed above and stated that SOI#1 was also runner for "Skip". Based on this investigation, including some of the facts set forth in this affidavit, I believe the individuals the Winooski PD CI identified are Garth OLSEN, Rajharsha NARAYANSWAMY, Cody SARGENT, and Stephanie BANFIELD.

70. The Winooski PD CI said that "Skip" had also instructed it to deposit cash into a TD bank account of a person named [redacted]"

71. The Winooski PD CI identified the phone number of 207-482-9256 as "Skip's" current phone number. The Winooski PD CI provided over 10 phone numbers that it had for "Skip."

72. Through my training and experience, I know that drug traffickers often frequently change their phone numbers to avoid law enforcement detection. Through my investigation, it appears that "Skip" is also using this tactic to avoid detection.

## X. Information from Garth OLSEN

73. On April 20, 2016 members of the Burlington RO were conducting surveillance of Cody SARGENT'S residence located at the apartment building of 415 Pearl Street, Burlington, Vermont. During that surveillance, I observed and identified Cody SARGENT exit and return to the apartment building of 415 Pearl Street.

74. At approximately 12:49 PM, I observed a gold Dodge Van, that was registered to Garth OLSEN, drive to 415 Pearl Street. I identified the driver as Garth OLSEN and saw OLSEN and a female occupant exit the van and enter 415 Pearl St. Minutes later, both OLSEN and the female occupant exited the residence and re-entered the gold minivan. OLSEN was followed to the area of 500 St. Paul Street where he parked and was approached by the investigators that were conducting surveillance.

75. I interviewed OLSEN about the day's events. OLSEN admitted to using heroin on a daily basis and that he had a hypodermic needle in the center counsel area. OLSEN denied that he had any drugs on him or in his vehicle and consented to the search of his person. OLSEN would later state that he was stopped by "Cody's" house to pick up heroin. OLSEN admitted that he was going to Cody's residence to exchange a "Slice" of marijuana for a bun of heroin, but that the transaction did not occur. OLSEN admitted that he had purchased one to two "sleeves" of heroin in the past to resell. Through my training and experience I know a sleeve to be approximately 100 bags of heroin.

76. OLSEN spoke about other individuals that he had would obtain heroin from. OLSEN stated that he would also purchase heroin from "Schuyler" and also provided the first name of SOI#1.

77. OLSEN consented to the search of his phone and I located the number (802) 355-3197 for "Schuyler" and (802) 793-6707 for "Cody". It should be noted that "Schuyler" was programmed in OLSEN'S phone with the spelling "Skyler".

78. SA Tom Doud and I attempted to have OLSEN call SARGENT to arrange the purchase of heroin. SARGENT did not answer and OLSEN proceeded to send SARGENT a text message that stated "still cant get a slice but I have cash need a bun". SARGENT replied, "K. I got grn ty though. I don't have a b. Did you cl d or sk?". I asked OLSEN who "sk" was. SA Doud asked if it was "Schuyler." OLSEN said that it was.

79. At that time, I was uncertain how much OLSEN was going to cooperate with law enforcement, so I decided to not specifically question OLSEN about "Skip." I obtained written consent to search the contents of OLSEN'S phone. IA Marilyn Epp utilized Cellbrite to download the contents of OLSEN'S phone. I located a phone number 207-482-9256 in OLSEN'S phone under the contact name "Hyle". This number was the same number that the Winooski PD CI provided law enforcement as belonging to "Skip."

80. OLSEN is a long term opiate addict.

## XI. Interviews with a SOI#1 and a Burlington Police Department Confidential Informant

81. On April 26, 2016, TFO Merchand and I interviewed SOI#1 who would later be accompanied by an individual who would later become a Burlington Police Department Confidential Informant and will be referred to as the Burlington PD CI.

82. As discussed above, I identified the SOI#1 by reviewing video surveillance footage of cash deposits into [redacted] TD Bank account.

83. The SOI and the Burlington PD CI were cooperating with law enforcement in hopes of receiving future consideration on any federal heroin charges. SOI#1 and the Burlington PD CI were advised no promises or predictions could be made in relation to its cooperation, but their cooperation would be relayed to prosecutor's. SOI#1 and the Burlington PD CI agreed to cooperate with law enforcement.

84. SOI#1 has criminal convictions for the following offenses: 1991 misdemeanor false police report in Alexandria, Virginia; 1996 misdemeanor unauthorized use and misdemeanor larceny in Fairfax, Virginia; 1996 felony theft in Pima County, Arizona; 1997 two misdemeanor driving under the influence of controlled substance in Camcnewport Beach, California; 1997 a misdemeanor conviction of possession of controlled substance paraphernalia in Camcenewport Beach, California; 1998 Misdemeanor drug paraphernalia possession in Broward County, Florida; 2001 misdemeanor driving under the influence in New York County, New York; 2003 felony convictions for lascivious conduct, unlawful constraint, and sexual assault in Washington County, Vermont; 2013 probation violations in Washington County, Vermont; 2015 misdemeanor retail theft in Chittenden County, Vermont.

85. On March 25, 2015 members of the Burlington RO conducted a controlled buy of heroin from SOI#1 by utilizing the Winooski PD CI discussed above.

86. The Burlington PD CI has misdemeanor convictions for Eluding Arrest in Chittenden County Vermont in 2015.

87. TFO Merchand revealed to SOI#1 that law enforcement had purchased drugs from it and that the SOI could potentially be charged in federal court. TFO Merchand explained how

SOI#1 could cooperate with law enforcement. TFO Merchand explained to SOI#1 that SOI#1 would likely be charged at some point in the future.

88. SOI#1 agreed to speak with TFO Merchand and I. Dan Merchand asked SOI#1 about SOI#1's knowledge of "Skip". SOI#1 explained how "Skip" typically arranged the drug transactions. The SOI said that heroin customers would call "Skip's" phone to order narcotics, but that "Skip" would never deliver the narcotics. SOI#1 said that "Skip" would facilitate the deal through the phone calls. SOI#1 stated that it had some of "Skip's" co-conspirators stay at its house when they came with heroin/cocaine.

89. SOI#1 said that "Skip" had also directed SOI#1 to go the bank to deposit the drug proceeds. SOI#1 said that it had made a $9,000 deposit, and $7,000 deposit into a TD Bank account, and that SOI#1 had given thousands of dollars to a subject it called "David WILLIAMS". As previously stated, I have viewed surveillance footage of SOI#1 depositing cash into [REDACTED] TD Bank account.

90. SOI#1 provided the phone numbers 802-829-8406 and 207-482-9256 for "Skip". It should be noted that the 207-482-9256 is the same number that I located in Garth OLSEN'S phone as well in a phone belonging to the Winooski PD CI.

91. SOI#1 also provided the phone number (802) 793-6707 for a subject it called "Cody", 802-355-3197 for a subject named "Sky". The numbers 802-793-6707 and 802-355-3197 are the same phone numbers that Garth OLSEN provided for Cody SARGENT and "Schuyler" respectively.

92. SOI#1 said that "Skip" typically changes his phone number once a month. SOI#1 showed text messages from a number that he/she said belonged to "Skip". Through the months of February to April 1, 2016 SOI#1 showed text messages between SOI#1 and "Skip". One message showed that the number 207-482-9256 established the price for "buns". Through my training and experience I know that "buns" is a term that refers to bundles of heroin.

93. SOI#1 also showed a text message on April 1, 2016 of a series of numbers that SOI#1 said was a bank account number that belonged to "Skip". SOI#1 stated that "Skip" had directed him/her to make cash deposits into a TD bank account. The bank account number provided was same account that belongs to [REDACTED]. Bank records also show that a $4,000.00 cash deposit was made on April 1, 2016.

94. On May 16, 2016, TFO Dan Merchand and I spoke to SOI#1 and the Burlington PD CI again. TFO Merchand and I instructed the Burlington PD CI to call the phone number 207-482-9256 for "Skip". The phone call went straight to voicemail. SOI#1 stated that it has made multiple attempts to call the number 207-482-9256, but the call went straight to voicemail. SOI#1 told TFO Dan Merchand and I that "Skip" frequently changed his phone number. SOI#1 also explained that when "Skip" or his associates were not in Vermont, "Skip" would turn off his phone.

95. SOI#1 stated he had been speaking with "Schuyler" about "Skip". SOI#1 stated that "Schuyler" sent him/her the phone number of 802-355-2933. SOI#1 stated that "Schuyler" said that the 802-355-2933 was "Skip's" new number.

96. The Burlington PD CI called number 802-355-2933 and a voice who the Burlington PD CI said was "Skip" answered the phone. The Burlington PD CI asked if he was around, but it appeared that "Skip" had hung up the phone before any conversation could ensue.

## XII. Phone Analysis of Phone Number 802-355-2933

97. I have analyzed the phone communications with the known co-conspirators and the phone number 802-355-2933. Between the dates of April 25, 2016 and May 15, 2016 the phone number 802-355-3197 has had 412 phone communications between the phone number 802-355-3197. This is the same phone number that Garth OLSEN and the SOI provided for "Schuyler".

98. Between the dates of April 25, 2016 and May 15, 2016 the phone number 802-355-2933 has had 471 phone communications between the phone number 802-793-6707. This was the same number that Garth OLSEN and the SOI provide for Cody SARGENT.

99. I have obtained subscriber records for the phone number 802-355-2933 from May 31, 2016 through June 5, 2016. Phone analysis showed that this phone number has not made any phone calls during this period.

100. Following the lack of activity for phone number 802-355-2933, I spoke to SOI#1 about any new phone numbers associated with "Skip". SOI#1 stated that it had heard from an associate that "Skip" had a new phone number, but that it did not know what it was.

## XIII. Interviews with the Burlington Police Department CI#2 and Burlington Police Department CI#3

101. On June 16, 2016, Burlington Police Department Detective Dwayne Mellis and Vermont State Police Detective Giancarlo DiGenova met with two subjects who provided information about "Skip". Detective Corporal Mellis would later register both individuals as Burlington Police Confidential Informants; herein identified as BPD CI#2 and BPD CI#3.

102. BPD CI#2 has convictions for the following offenses: 1996 misdemeanor retail theft in Chittenden County, Vermont; 1999 felony retail theft in Chittenden County, Vermont; 2000 misdemeanor retail theft in Chittenden County, Vermont; 2000 misdemeanor unlawful trespass in Chittenden County, Vermont; 2000 misdemeanor retail theft in Chittenden County, Vermont; 2000 misdemeanor provide false info to law enforcement in Chittenden County, Vermont; 2002 misdemeanor retail theft in Chittenden County, Vermont; 2005 felony for retail theft in Chittenden County, Vermont; 2009

misdemeanor retail theft in Chittenden County, Vermont; and seven probation violations in Vermont.

103. BPD CI#3 has convictions for the following offense: 1989 federal felony conviction for conspiracy to distribute cocaine in Vermont; 1989 felony burglary in Chittenden County, Vermont; 1996 felony buy, sell, possess, or receive stolen property in Chittenden County, Vermont; 1999 misdemeanor driving with a suspended license in Chittenden County, Vermont; 2000 misdemeanor driving with a suspended license in Chittenden County, Vermont; 2001 misdemeanor driving with a suspended license in Chittenden County, Vermont; 2004 misdemeanor retail theft in Chittenden County, Vermont; 2008 heroin sale in Chittenden County, Vermont; 2015 misdemeanor retail theft in Chittenden County, Vermont; 2016 misdemeanor petit larceny in Chittenden County, Vermont; and three probation violations in Chittenden County Vermont.

104. Law enforcement suspects that BPD CI#2 and BPD CI #3 were involved with a drug distribution organization different from "Skip's" organization. At the time of the interview with Detectives DiGenova and Mellis, BPD CI#2 and BPD CI#3 were made aware of law enforcement's suspicions.

105. Detective Mellis and Detective DiGenova's spoke to BPD CI#2 and BPD CI#3 about their knowledge of "Skip". BPD CI#3 stated that it had just purchased narcotics on June 16, 2016 a couple hours prior to meeting with the detectives. BPD CI#2 and BPD CI #3 told law enforcement that they had called "Skip" to order heroin, but that "Joe Mayo" conducted the hand to hand transaction. BPD CI#2 and BPD CI#3 stated that "Joe Mayo" was "Skip's" current runner. BPD CI#2 and BPD CI#3 said that "Skip" gives them instructions over the phone where to meet his narcotics runners. BPD CI#2 and BPD CI#3 said that "Joe Mayo" who selling running narcotics in the area of Riverside Avenue in Burlington.

106. BPD CI#2 and BPD CI#3 provided the number 802-503-4814 as "Skip's" current phone number. BPD CI#2 and BPD CI#3 also provided the phone numbers 802-355-2933 and 802-829-8406 as phone numbers associated with "Skip". As previously stated, the phone number 802-355-2933 and 802-829-8406 are the same phone numbers that SOI#1 provided for "Skip". BPD CI#2 and BPD CI#3 also provided the phone number 802-782-9790 for "Joe Mayo".

## XIV. Phone Analysis of Phone Number 802-503-4814

107. Prior to Detective Mellis and Detective DiGenova's interview with BPD CI#2 and BPD CI#3, I obtained phone records for "Skip's" known co-conspirators in order to attempt to locate "Skip's" new phone number. I analyzed common phone numbers that the co-conspirators called which led me to obtain toll and subscriber records for 802-503-4814, which is an AT&T Tracphone. AT&T did not have any subscriber information for a name of the person who purchased the phone. The phone has been active since June 10, 2016.

108. I have analyzed the phone communications with the known co-conspirators and the 802-503-4814. Between the dates of June 12, 2016 and June 16, 2016 the 802-503-4814 has had 78 phone communications between the phone number 802-355-3197. This is the same phone number that Garth OLSEN and the SOI#1 provided for "Schuyler."

109. Between the dates of June 11, 2016 and June 16, 2016 the 802-503-4814 has had 126 phone communications between the phone number 802-793-6707. This was the same number that Garth OLSEN and the SOI#1 provide for Cody SARGENT.

110. Between the dates of June 11, 2016 and June 16, 2016 the 802-503-4814 has had 208 phone communications between the phone number 802-782-9790. This is the same phone number that BPD CI#2 and BPD CI#3 provided for Joe MAYO.

## XV. Controlled Purchase on June 23, 2016

111. On the afternoon of June 23, 2016 TFO Daniel Merchand met with BPD CI#2 and BPD CI#3 at the Burlington Police Department with Detective DiGenova and Detective Mellis. BPD CI#2 and BPD CI#3 advised they had talked to the 802-503-4814 as recently as the day prior. BPD CI#3 advised it had purchased heroin earlier this day from Joe MAYO on North Winooski Avenue in the City of Burlington. BPD CI#2 and BPD CI#3 agreed they could purchase heroin again on this day if they called 802-503-4814. BPD CI#3 in the presence of TFO Merchand placed a recorded telephone call to the 802-503-4814 and arranged to purchase a quantity of heroin. BPD CI#3 was informed that it would receive a call back of a location where BPD CI#3 would need to go to complete the purchase. A short time later received an incoming call from 802-503-4814, which was also recorded by TFO Merchand. BPD CI#3 was informed it needed to go to North Winooski Avenue.

112. The person of BPD CI#3 was searched and no drugs, contraband, or large amounts of currency were located. BPD CI#3 was provided with sufficient funds of US currency to complete the transaction; the serial numbers of the funds were recorded prior being given to BPD CI#3. BPD CI#3was outfitted with an electronic audio transmitter for the purpose of recording and monitoring the anticipated transaction. Detective Bellavance of the Burlington Police Department acting in an undercover capacity transported BPD CI#2 and BPD CI#3 to the area of the anticipated meet location. Detective Sgt. Couture observed Joe MAYO in the area of the anticipated meet location. Detective Sgt. Couture observed MAYO walk down the driveway of 42 North Winooski Avenue. Detective Bellavance transported BPD CI#2 and BPD CI#3 to the area and BPD CI#3 got out of the vehicle and made an outgoing phone call. BPD CI#3 was then observed walking down the same driveway MAYO had been observed going down. After a short time later BPD CI#3 was observed coming back out of the driveway and got back into the vehicle with Detective Bellavance. BPD CI#3 then displayed two knotted baggies of a tan powder to Det. Bellvance, and turned the baggies over to Detective Bellavance. A random sample from one of the baggies was later field-tested, which tested positive for the presence of

heroin. Detective Bellavance transported BPD CI#2 and BPD CI#3 from the area and they were transported back to the police department. BPD CI#3 person was searched again and no drugs, contraband or large amounts of currency were located.

113. BPD CI#3 advised the person it spoke with on the 802-503-4814 was a male, but was unsure if it was the male it knew as "SKIP". BPD CI#3 advised the 802-503-4814 is for "SKIP", but "SKIP" will sometimes have another male or two answer the phone. BPD CI#3 thought the male that answered the phone was a male that works with "SKIP". BPD CI#3 advised when it arrived at the meet location it called MAYO. BPD CI#3 advised MAYO directed BPD CI#3 down the driveway and met him down back on a porch area. BPD CI#3 advised it provided the money to MAYO and MAYO provided BPD CI#3 with the heroin it turned over to Det. Bellavance.

## XVI. Search warrant for GPS location information for the phone number 802-503-4814

114. Following the controlled buy from on June 23, 2016 I obtained a search warrant for the location information for the phone number 802-503-4814. Upon the execution of the search warrant, I began to monitor the location information on the phone.

115. On June 25, 2016 as part of this investigation I was monitoring the location information on the phone number 802-503-4814. The GPS location information on the phone number 802-503-4814 indicated that it was at Oakledge Park, in Burlington, Vermont. In response to this, TFO Merchand, DEA SA Tom Doud, and I conducted surveillance in and area around of Oakledge Park in Burlington, VT. I observed a male at the park in the same area where the GPS location information indicated that the phone was. TFO Merchand was conducting video surveillance of the male in the park as I called 802-503-4814. The male being videotaped by TFO Merchand answered a cellular telephone. Following the phone call the male left the area in a vehicle and Burlington Police conducted a motor vehicle stop of vehicle. During the stop the male presented a New York State photo identification with the name Leander HANNIBAL.

116. Following the June 25 traffic stop Detective Mellis and TFO Merchand met with BPD CI#2 and directed BPD CI#3 to place a recorded call to 802-503-4814 to inquire about a purchase. The first call was unanswered and a second recorded call was placed to 802-503-4814. When BPD CI#3 placed the calls to 802-503-4814 I had HANNIBAL under observation. The first call went unanswered. On the second phone call I observed HANNIBAL reach into his right pocket. I then observed HANNIBAL appear to pull an object out of his pocket. I then observed HANNIBAL position his head and shoulder as if he had placed a phone there.

## XVII. Events of July 15, 2016

117. On July 15, 2016 I continued to monitor the location information of the possessor of 802-503-4814. The GPS location information indicated that the possessor of the 802-503-4814 was in the area of Ethan Allen Parkway in Burlington, Vermont.

118. During the evening of July 15, 2016 Detective Mellis and TFO Merchand met with BPD CI#2 and BPD CI#3 advised that the current holder of 802-503-4814 currently had heroin and crack cocaine available for purchase. BPD CI#3 suspected that it would be directed to a different "runner" than MAYO after contacting the 802-503-4814. BPD CI#3 anticipated it would have to travel to the area of the Rite Aid on North Avenue by Ethan Allen Parkway. Based on the location provided by BPD CI#3 for the anticipated meeting and the GPS location information indicating that that holder of 802-503-4814 was in the same area, surveillance was established to monitor a residence on Ethan Allen Parkway. This is the same area where I knew SOI#1 and BPD CI#1 to reside at.

119. A plan was formulated to utilize BPD CI#3 to conduct a controlled purchase of heroin and crack cocaine by calling the 802-503-4814. BPD CI#3 and its vehicle were searched and no drugs, contraband, or large amounts of currency were located. BPD CI#3 was also provided with sufficient funds of US currency to complete the anticipated transaction; the serial numbers of the funds were recorded prior to being given to BPD CI#3. BPD CI#3 was outfitted with an electronic audio transmitter for the purpose of monitoring and recording the anticipated transaction. Surveillance was established in the area of the anticipated meet location and of SOI #1's residence. TFO Robert Estes acting in an undercover capacity was going to transport BPD CI#3 to and from the meet.

120. BPD CI#3 placed two recorded telephone calls to the 802-503-4814 and arranged to purchase a known amount of heroin and crack cocaine. BPD CI#3 was directed by the male answering the 802-503-4814 to an area on North Avenue for the purchase. Following the telephone call where BPD CI#3 received the meet location from 802-503-4814 SA Chetwynd observed SOI#1 exit its residence and surveillance units observed SOI#1 travel to the arranged meet location between BPD CI#3 and the SOI#1. It should be noted BPD #3 did not know if the male answering the 802-503-4814 was the same individual BPD CI#3 had previously spoken with in June.

121. TFO Estes transported BPD CI#3 to the meet location and TFO Estes and surveillance units observed BPD CI#3 get out of the vehicle with TFO Estes and enter SOI#1's vehicle. After a brief meeting BPD CI#3 got out of SOI#1's vehicle and got back into the vehicle with TFO Estes. When BPD CI#3 entered the vehicle with TFO Estes BPD CI#3 turned over knotted baggies of suspect crack cocaine and heroin it had received from SOI#1. TFO Estes transported BPD CI#3 from the area and surveillance units observed SOI#1 leave the meet location and return to its residence.

122. Following the purchase TFO Estes transported BPD CI#3 to meet with Detective Mellis and TFO Merchand. The person of BPD CI#3 was searched again and no drugs, contraband, or large amounts of currency were located. BPD CI#3 advised it gave the serialized currency to SOI#1 and obtained the drugs it turned over to TFO Estes from SOI#1. Detective Mellis tested a random sample from one of the baggies of suspect crack cocaine and one of the baggies from the suspect heroin that BPD CI#3 had purchased. The suspect crack cocaine tested positive for the presence of cocaine and the suspect heroin tested positive for the presence of heroin.

123. Following the purchase TFO Merchand and I contacted SOI#1 and met with SOI#1 during the evening of July 15, 2016. SOI#1 admitted that there was currently a male in its residence that had heroin and crack cocaine. SOI#1 further advised it had been going out and making deliveries and running errands on behalf of the male. SOI#1 advised one of the errands it had conducted on behalf of the male was to bring approximately 20 baggies of heroin and 20 baggies of crack cocaine to a male over on North Winooski Avenue. SOI#1 advised it had also obtained a scale so the male at its residence could weigh the narcotics the male had in SOI#1's apartment. SOI#1 advised the male was in possession of distribution quantities of heroin and crack cocaine that SOI#1 had seen at its residence. TFO Merchand showed SOI#1 a previous surveillance photograph taken of HANNIBAL during the surveillance in Oakledge Park. SOI#1 advised HANNIBAL was the male currently in its residence. SOI#1 was instructed by TFO Merchand and I to provide HANNIBAL with a reason to leave the residence.

124. On the evening of July 15, 2016 TFO Merchand observed a Green Cab parked in the driveway of where SOI#1 resides. Following the cab leaving the residence SOI#1 contacted TFO Merchand and advised HANNIBAL had just left the residence in a cab. SOI#1 further advised HANNIBAL would not leave drugs with SOI#1 or BPD CI#1 because of their addiction. SOI#1 advised it suspected the drugs would be located in HANNIBAL's under garments as HANNIBAL had been going in and out of the bathroom while at its residence.

125. Late in the evening, Burlington Police conducted a traffic stop of the Green Cab on North Avenue in the area of Washington Street. There was a single driver of the cab and HANNIBAL was located in the rear passenger side seat in the cab. Members of DEA and Burlington Police approached the vehicle and ordered HANNIBAL from the vehicle and he was placed under arrest. I called the 802-503-4814 and buzzing noise could be heard emitting from inside the rear compartment of the taxi in the rear pocket located on the back of the front passenger seat, right in front of where HANNIBAL had been seated. TFO Merchand asked the cab driver if he searched his taxi after passengers exit his taxi and he advised he did, and that the phone had not been there prior to picking up HANNIBAL. The driver further contacted his dispatcher and inquired what phone number had been provided for the pickup. The cab driver provided the number for the 802-503-4814 as the number that had been used for the pickup of HANNIBAL. A second call was placed to the 802-503-4814 to confirm and he phone located in the taxi rang again.

126. A search of HANNIBAL's person revealed approximately $980 in US currency in his left front shorts pocket. A later check of the serial numbers of the money seized revealed the serialized currency utilized from the controlled purchase earlier in the evening conducted by BPD CI#3 from SOI#1, after having called 802-503-4814.

127. HANNIBAL was transported back to the Burlington Police Department where other officers and TFO Merchand conducted a thorough search of HANNIBAL. HANNIBAL had a knotted plastic sandwich bag containing several individual knotted baggies of

suspect crack cocaine and suspect heroin underneath his testicles. TFO Merchand recognized the packaging as consistent with the packaging purchased by BPD CI#3 earlier and in the manner consistent for distribution. DEA SA Brandon Hope tested a random sample from one of the baggies of suspect crack cocaine and one of the baggies from the suspect heroin from the bag located underneath HANNIBAL's testicles. The suspect crack cocaine tested positive for the presence of cocaine and the suspect heroin tested positive for the presence of heroin. In total the suspect heroin weighed approximately 17.7 grams and the suspect crack cocaine weighed 30.9 grams. I recognize these amounts and manner of packaging to be consistent with an intention to distribute and not an amount for personal use.

**XVIII. Phone Analysis of Phone Number 917-780-9282 (the TARGET CELL PHONE)**

128. I have analyzed the phone communications with the known co-conspirators and the number 917-780-9282 which is a T-Mobile cell phone. The phone number 917-780-9282 will herein be referred to as the TARGET CELLPHONE. T-Mobile did not have any subscriber information for a name of the person who purchased the phone. The phone has been active since August 28, 2015. It should be noted that this is only one day after ADAMS was encounter by members of the Burlington RO at Stephanie BANFIELD'S apartment.

129. DEA Financial Investigator Michael Dubois located an insurance claim that [redacted] submitted for accident that occurred in December, 2015. In that claim, [redacted] provided the phone number 631-507-1568 as her contact phone number. Between the dates of January 1, 2016 and September 9, 2016 the TARGET CELLPHONE has had 1998 phone communications between the phone number 631-507-1568. It should be noted that during the same time period, phone records of the phone number 631-507-1568 indicate 12,074 phone communications with the TARGET CELLPHONE. At this time it is unknown why there are discrepancies in the phone records.

130. Between the dates of July 6, 2016 and July 11, 2016 the TARGET CELLPHONE has had 2 phone communications between the phone number 802-793-6707. This was the same number that Garth OLSEN and the SOI#1 provide for Cody SARGENT.

131. Between the dates of January 28, 2016 and April 9, 2016 the TARGET CELLPHONE has had 9 phone communications between the phone number 802-343-4533. This is the same phone number that the Winooski PD CI provided for itself.

132. Between the dates of June 7, 2016 and July 4, 2016 the TARGET CELLPHONE has had 9 phone communications between the phone number 802-503-4020. This is the same phone number that TFO Dan Merchand received for the Winooski PD CI from one of its relatives.

133. On June 10, 2016 the TARGET CELLPHONE has had 2 phone communications with the phone number 802-503-4814. This is the same phone number that HANNIBAL possessed during his arrest on July 15, 2016.

134. As described throughout this affidavit [redacted], HANNIBAL, SARGENT, and the Winooski PD CI have been all been substantially involved in the ADAMS/STEWART heroin and cocaine drug trafficking organization.

135. Intel Analyst Matt Benoit, conducted an open source search of the phone number 917-780-9282 and located a Facebook account under the name "Kranky Kon" that had the username skip.states. This Facebook account also "likes" the "Skip States Entertainment" Facebook page. As previously described in this affidavit, Skip States Entertainment is the LLC associated with Corey ADAMS/Korey STEWART.

136. Based on the foregoing, there is probable cause to believe that the Location Information from the TARGET CELL PHONE will continue to lead to evidence regarding the commission of the TARGET OFFENSES. Among other things, it has been my experience that obtaining real time location information of the type sought herein is relevant and material because it reveals the location of individuals involved in the drug trafficking, the locations of meetings with other co-conspirators, the locations of so-called "stash houses" for drugs and financial institutions where targets often try to "legitimize" their drug proceeds, as well as locations used to hide from law enforcement. The utilization of this type of electronic surveillance also facilitates physical surveillance and the identification of participants in the controlled substance offenses under investigation.

137. The execution of this warrant will not result in the seizure of any tangible property or a wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

138. WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and order authorizing agents of the DEA to obtain the Location Information on an ongoing, real-time basis for a period of thirty (30) days from the date of the Court's warrant and order.

139. IT IS FURTHER REQUESTED that the Court direct T-MOBILE to assist agents by providing all information, facilities and technical assistance needed to ascertain the Location Information, and further direct T-MOBILE, the service provider for the TARGET CELL PHONE, to initiate a signal to determine the location of the TARGET CELL PHONE on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed warrant, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of the TARGET

CELL PHONE, for a period of thirty (30) days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the government.

140. IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELL PHONE outside of daytime hours.

141. IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize that notice be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extensions thereof. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result" on this ongoing investigation pursuant to 18 U.S.C. §§ 2705, 3103a(b)(1). Providing prior notice to the subscriber or user of the TARGET CELL PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person(s) an opportunity to destroy evidence, change patterns of behavior, notify co-conspirators, conduct financial transactions to hide assets, and/or flee from prosecution.

142. IT IS FURTHER REQUESTED that the warrant, the order, the application, and this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and T-MOBILE, as necessary to effectuate the Court's warrant and order.

Dated at Burlington, in the District of Vermont, this 15th day of September, 2016.

Special Agent Mark Persson
U.S. Drug Enforcement Administration

Sworn to and subscribed before me this 15th day of September, 2016.

JOHN M. CONROY
United States Magistrate Judge