U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 NOV 20 PM 1: 35

CLERK

BY_____ /s/
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,          )
                                   )
         v.                        )          Case No. 2:18-cr-00030-1
                                   )
KOREY STEWART,                     )
                                   )
         Defendant.                )

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS AND
## MOTION TO DISMISS THE INDICTMENT
(Docs. 265-1 & 265-2)

Pending before the court are two motions filed by Defendant on September 18, 2019. Defendant moves to suppress all evidence obtained during his detention on August 27, 2015 under Federal Rule of Criminal Procedure 5 on the grounds that he was not presented to a magistrate judge following his arrest, and to suppress a pretrial identification procedure conducted using a single photograph. (Doc. 265-1.) Defendant also moves to dismiss the Third Superseding Indictment (the "Indictment") against him, arguing that the delay between his arrest and indictment violated Federal Rule of Criminal Procedure Rule 48(b) and the Speedy Trial Act, 18 U.S.C. §§ 3161(b) and 3162(a)(1). (Doc. 265-2.)

On October 2, 2019, the government opposed Defendant's motion. Defendant filed a reply on October 22, 2019, at which time the court took the pending motions under advisement.

Defendant is represented by Kevin M. Henry, Esq. and Avi J. Springer, Esq. The government is represented by Assistant United States Attorneys Jonathan Ophardt and Spencer Willig.

## I.    Factual and Procedural Background.

The facts are derived from the court's prior findings of fact set forth in its February 8, 2019 Opinion and Order Denying Defendant's Motion to Suppress as well as

from the parties' briefing. On August 27, 2015, as part of an interdiction detail, Drug Enforcement Administration ("DEA") agents were conducting surveillance of a known heroin user who had arrived in a vehicle with a female passenger at the La Quinta hotel in South Burlington, Vermont. The known heroin user was later identified as Cody Sargent. DEA Special Agent Mark Persson ("SA Persson"), an experienced DEA Agent, was part of the interdiction detail. Based on his observations at the La Quinta hotel, he followed Mr. Sargent's vehicle to the Cumberland Farms gas station in Colchester, Vermont. At the gas station, SA Persson observed Mr. Sargent exit his vehicle and enter the vehicle of a female, later identified as Stephanie Banfield. A few moments later, Mr. Sargent exited Ms. Banfield's vehicle and returned to his vehicle.

SA Persson and DEA Special Agent Tom Doud ("SA Doud") approached Ms. Banfield and questioned her. She initially denied selling heroin to Mr. Sargent and stated she had money in her vehicle which was from her father and from an unemployment check. She later admitted that she had just engaged in a heroin transaction with Mr. Sargent and provided substantial information regarding her drug dealing activities in three interviews. While Ms. Banfield was questioned by SAs Persson and Doud, other DEA agents questioned Mr. Sargent who stated that he had purchased heroin from Ms. Banfield. Agents searched Mr. Sargent's car, found what they suspected to be heroin, and Ms. Banfield was arrested. A search of her car yielded plastic baggies, suspected heroin, and $900 in cash. A search of Ms. Banfield's person yielded approximately $2,623 in cash in her bra.

In the course of interviews by law enforcement, Ms. Banfield admitted that she was a heroin user and drug dealer. She identified two men, known to her as "T" and "Skip," as her primary sources for heroin and crack cocaine. She stated that she would typically contact Skip or T to have narcotics delivered to her by a "runner." She described Skip as being "the boss" for whom T worked. She noted that Skip had approximately six to eight runners working for him as well as various females who transported drugs from New York City to Vermont. Although Skip would typically distance himself from the drugs he distributed and would leave drugs at a runner's

2

residence rather than hold them himself, she saw Skip occasionally when he was in Vermont. She advised that Skip and T sometimes used the same phone to conduct drug transactions with their customers. She provided the agents with two telephone numbers for T and one for Skip.

Ms. Banfield described T as a tall, skinny, African American male from New York with no tattoos, dreadlocks, or facial hair. She further advised that T drove a white Volvo with out-of-state license plates from which the front license plate was missing. She noted that she had seen T the day before and that he would "often" show up at her house and on occasion was accompanied by Skip. She identified Skip as an African American male from New York. Ms. Banfield told SA Persson that a woman named "Amber" was associated with T and Skip and that she had made two deposits of drug proceeds into Amber's bank account, one in the amount of $8,000 and the other for approximately $8,400. Ms. Banfield noted that she had received a text from Skip or T advising her how to make the deposits and providing Amber's account number. She reported that an individual named "Raj" had also made deposits into Amber's account. Ms. Banfield asserted that she had drugs and money belonging to T in her apartment at 79 Susie Wilson Road, Essex Junction, Vermont and that T had given her twenty bags of heroin the day before, for which she owed him $1,600. Ms. Banfield stated that there was a large quantity of crack cocaine in her couch and a TD Bank receipt from a deposit of drug proceeds into Amber's account located in one of her closets. Ms. Banfield provided names, phone numbers, and certain other identifying details regarding approximately seven other drug associates of Skip and T.

Ms. Banfield told law enforcement that she was selling drugs on a daily basis and explained that after she sold the drugs T provided her, T would either come to her residence to collect the proceeds from her or she would deposit the money into Amber's bank account. She explained that she and T had an agreement whereby he sold narcotics to her at a flat rate and she was entitled to keep any proceeds she made beyond that rate. She stated that T would be stopping by to collect money but she was unsure when he

3

would arrive. Ms. Banfield provided written consent for law enforcement to search her apartment.

SA Persson relayed the information from Ms. Banfield to members of the interdiction team. A search team proceeded to Ms. Banfield's apartment which was located in a two-building apartment complex with twelve units on a dead-end road accessed via Susie Wilson Road which terminates approximately a quarter of a mile past the complex. The parking area in front of the complex has spaces for approximately twenty vehicles. At the time of the search, there were approximately ten other vehicles in the parking lot.

At approximately 7:30 p.m. on the evening of August 27, 2015, nine law enforcement officers searched Ms. Banfield's apartment. During their search, DEA Special Agent Brian Villella ("SA Villella"), the Resident Agent in Charge of the Burlington DEA office, conducted surveillance from an unmarked law enforcement vehicle on the dead-end portion of Susie Wilson Road with his vehicle parked facing the driveway of Ms. Banfield's apartment. He was watching for individuals who might approach Ms. Banfield's apartment during the search based on information relayed to him by SA Persson. During an approximately half-hour period of surveillance, SA Villella observed only one vehicle drive past him as it departed from another apartment complex.

Inside Ms. Banfield's apartment, law enforcement agents located a quantity of crack cocaine in her couch and crack cocaine and cocaine elsewhere along with a tan powdery substance in her bedroom that Ms. Banfield had not previously mentioned. Although she had estimated she had approximately $1,000 in her apartment, agents located $2,323 in a pink wallet. In Ms. Banfield's bedroom closet, the agents located a TD Bank receipt indicating an $8,460 deposit. They also found a Western Union receipt.

While agents were searching Ms. Banfield's apartment, SA Villella observed somebody driving towards Ms. Banfield's apartment who matched the description the interdiction team had provided him. The person was operating a white Volvo with a Florida back license plate and a missing front plate. The white Volvo turned into the

4

driveway leading to Ms. Banfield's apartment complex and parked facing Ms. Banfield's apartment with its headlights illuminated. In less than two minutes, SA Villella saw a brown Nissan Maxima with out-of-state license plates pull into the driveway to the apartment complex and park next to the white Volvo, approximately two car widths away. This vehicle also faced Ms. Banfield's apartment with its headlights illuminated. SA Villella could not see how many people were in the Nissan Maxima or what they looked like. He advised the search team that two vehicles were outside, and that the occupants remained in the vehicles. He directed them to make contact with the vehicles' occupants.

After receiving SA Villella's report, the agents inside Ms. Banfield's apartment stopped their search and, due to a concern that the individuals outside the apartment might be armed, put on their tactical gear. A few minutes later, at approximately 8:00 p.m., they exited the apartment building in two groups and approached both vehicles. Upon exiting the apartment building, the agents could see the vehicles which were facing them, parked approximately 100 feet away, but because it was growing dark outside, they were unable to see into the vehicles or determine the number of occupants. The agents ran toward the vehicles due to a concern that the vehicles would leave or attempt to hit them. DEA Special Agent Timothy Hoffmann ("SA Hoffmann") credibly testified at the December 11, 2018 hearing on Defendant's first motion to suppress that the law enforcement agents drew their weapons to ensure officer safety as they were leaving a known drug house and one of the vehicles was associated with Ms. Banfield's source of supply. An agent with a drug detection canine was among the agents who approached the vehicles.

As the agents ran toward the vehicles, they shouted "police," "hands up," and "get out of the car." After opening the driver's side door of the Nissan Maxima, agents ordered the female African American operator out of the vehicle; the female complied and was handcuffed. Seconds later, SA Hoffmann asked the woman her name and she replied that her name was Amber and produced a Connecticut driver's license indicating her name was Amber Williams-Eason. At the same time, agents approached the

5

passenger side of the Nissan Maxima, opened the door, and pulled Defendant out of the vehicle, placed him on the ground, and handcuffed him there. Thereafter, Defendant provided agents with a New York driver's license with the name Corethious Bryant. At the time, law enforcement had no reason to believe Defendant's identification was false.

In his testimony at the December 11, 2018 hearing, Defendant confirmed that he drove to 79 Susie Wilson Road on the date in question with Amber Williams-Eason. He contended, however, that the vehicle in which he was traveling was a full football field behind the white Volvo and parked next to a SUV and that there was space for two vehicles between the Volvo and the Nissan Maxima. Defendant testified that he was pulled out of the Nissan Maxima by law enforcement agents with "a little nudge" but was compliant with their requests to get on the ground. Somewhat inconsistently he testified that he was grabbed by the collar of the shirt, forced onto the ground, and handcuffed within seconds. He was on the ground for a short period of time before he was permitted to stand up. When he was asked for identification, he indicated it was in his pocket. The agents retrieved a New York identification card from Defendant.

Defendant, Ms. Williams-Eason, and the driver of the white Volvo, who was identified as David Williams, were arrested and transported to a police station for processing. Defendant states that, prior to commencing "normal booking procedures," Defendant asked an agent why he would be fingerprinted and photographed. (Doc 265-1 at 2.) According to Defendant, the agent responded that Defendant was "being charged with conspiracy." *Id.* Defendant asserts he was photographed, fingerprinted, and "booked on conspiracy charges" by SA Persson. *Id.* Law enforcement began to interview Defendant, but the interview was terminated when Defendant requested an attorney. At some point while Defendant was at the police station, law enforcement conducted a search incident to arrest of Defendant's person and the brown Nissan Maxima. *Id.* at 1-2. According to SA Persson's testimony, neither search yielded narcotics. (Doc. 187 at 51:5-21.)

Approximately two hours later, Defendant was released "pending further investigation." (Doc 265-1 at 2.) Law enforcement retained his cell phones and told

Defendant "they were being held as evidence." *Id.* According to Defendant, no criminal complaint was filed, and he was not presented before a magistrate judge. At an unidentified time, law enforcement showed Ms. Banfield photographs of Defendant and Mr. Williams. Ms. Banfield identified Defendant from his photograph as "Skip" and Mr. Williams as "T."[1] Following Defendant's release from custody, law enforcement used fingerprints and a database to identify Defendant as Korey Stewart.

On March 9, 2018, a criminal complaint was filed against Defendant for conspiracy to distribute heroin, fentanyl, cocaine, and cocaine base in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(B). Defendant was subsequently arrested on March 15, 2018 and on March 22, 2018 with a one-count indictment charging him with conspiring to distribute heroin, fentanyl, cocaine, and cocaine base. In a Third Superseding Indictment, Defendant is presently charged with an additional count of conspiring to deposit and withdraw cash proceeds of the alleged unlawful distribution conspiracy in Connecticut and Vermont.

On February 8, 2019, the court denied Defendant's motion to suppress and held that Defendant's arrest was supported by probable cause because "the totality of the circumstances would lead a reasonable person to believe that Defendant was a participant in criminal activity with T and Amber as they approached the scene of a known drug house at which law enforcement had just located both drugs and drug proceeds." (Doc. 190 at 13.) The court denied Defendant's second motion to suppress, filed by his new counsel, on September 4, 2019 related to a September 22, 2016 traffic stop in New Hampshire that supplied the basis for a search of Defendant's person and a search warrant for the red Dodge Durango. Thereafter, the court allowed Defendant to file supplemental motions that he drafted himself in order to foreclose another request for a

---

[1] At the December 11, 2018 motion to suppress hearing, SA Persson testified regarding the timing of Ms. Banfield's single-photograph identification, explaining that photographs were taken while Defendant was in custody on August 27, 2015, and that those photographs were "given to Tom Doud, who then showed them to Miss Banfield." (Doc. 187 at 52:1-53:1.) SA Persson was not sure how the photographs were sent to SA Doud, and SA Persson was not present for Ms. Banfield's identification.

change in counsel and to recognize Defendant's belief that additional suppression motions were warranted by the facts and the law. Although Defendant's motions indicate they are submitted "through counsel," (Docs. 265-1 at 1; 265-2 at 1), they are only signed by Defendant.

## II.  Conclusions of Law and Analysis.

### A.  Whether Evidence Obtained During Defendant's Detention on August 27, 2015 Should Be Suppressed.

Defendant moves to suppress "all evidence obtained during [his] unnecessary detention" on August 27, 2015, and all "fruits of the obtained evidence" because he was not taken before a magistrate judge after his arrest, which he alleges violates Fed. R. Crim. P. 5. (Doc. 265-1 at 1.) He argues that his detention was a "deliberate, pre-planned attempt by the police to violate a suspect's constitutional rights by engaging in a subterfuge" and that "[t]he only reason for arresting [him] was to search for incriminating evidence, contraband, and/or a confession[,]" rendering his arrest "pretextual." *Id.* at 3, 8. He further asserts that law enforcement lied to him by telling him that he was being charged for a conspiracy when in fact law enforcement only wanted to investigate other crimes through the use of his fingerprints and photographs.

The government responds that Defendant was arrested based upon probable cause for narcotics trafficking, processed at a police station without undue delay, and released within two hours of being taken into custody. It contends that Fed. R. Crim. P. 5 does not apply because no charges were filed against Defendant on or about August 27, 2015, and it contends that no constitutional violations took place.

Defendant first argues that a "federal agent" cannot "make a warrantless arrest, supported by probable cause[,] then hold the suspect in an attempt to secure evidence and a confession all before releasing the arrested person [for] further investigation." (Doc. 265-1 at 8.) Provided an arrest is supported by probable cause, law enforcement may temporarily detain an arrestee during the booking procedure which may include taking an arrestee's fingerprints and photographs, asking pedigree questions, and conducting a search incident to arrest because a "valid warrantless arrest . . . provides legal

8

justification 'for a brief period of detention to take the administrative steps incident to arrest.'" *Warren v. City of Lincoln, Neb.*, 864 F.2d 1436, 1441 (8th Cir. 1989) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).  Holding an individual whose warrantless arrest was supported by probable cause for "approximately two hours and twenty minutes" for questioning "about his background and activities that night, fingerprint[ing], [and] photograph[ing] . . . falls well short of the extended restraint of liberty" prohibited by the Fourth Amendment. *Id.* at 1442; *see also Maryland v. King*, 569 U.S. 435, 465-66 (2013) (ruling that "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody," "fingerprinting and photographing" are "legitimate police booking procedure[s] that [are] reasonable under the Fourth Amendment").

   Although Defendant argues that his arrest was "pretextual" and solely used as an "investigative tool designed to coerce [D]efendant's cooperation in the officer's effort to gather evidence for an alleged crime that the officer had no intent on charging the defendant with or any intent on bringing the defendant to a judge or magistrate to begin with," (Doc. 265-1 at 4-5), the Supreme Court has held that, provided an arrest is supported by probable cause, the officer's motivation is irrelevant.  As the Supreme Court explained in *Whren v. United States*, 517 U.S. 806 (1996):

> We [have] flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification.  In *United States v. Robinson*, 414 U.S. 218 [] (1973), we held that a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was "a mere pretext for a narcotics search," *id.*[] at 221, n.1[]; and that a lawful postarrest search of the person would not be rendered invalid by the fact that it was not motivated by the officer-safety concern that justifies such searches, *see id.*[] at 236[].

*Id.* at 812-13; *see also United States v. Pascarella*, 84 F.3d 61, 72 (2d Cir. 1996) ("[A]s long as 'a valid basis for a detention and search . . . exists . . . [it] is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search.") (second and third alteration in original) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir. 1987)).  This is because "[s]ubjective intentions

play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. A pretextual arrest for investigative purposes may therefore be lawful where, as here, it is supported by probable cause.

Defendant next argues that he "should not have been strip searched unless the agents had reason to suspect that [he] was hiding something." (Doc. 277 at 3.) As he concedes, however, "[w]arrantless strip searches of an arrestee in police stations are commonly justified as searches incident to a lawful arrest." *Id.*; *see also United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."). Narcotics violations in particular are "the kinds of crimes, unlike traffic or other minor offenses, that might give rise to a reasonable belief that the . . . arrestee was concealing an item in a body cavity." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983). [2]

Fed. R. Crim. P. 5 was also not violated in the course of Defendant's arrest. It requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A). "If a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed." Fed. R. Crim. P. 5(b). Rule 5, however, does not impose an affirmative obligation on law enforcement to charge an arrestee with a criminal offense. *See United States v. Jones*, 676 F.2d 327, 331 (8th Cir. 1982) ("Nothing in [R]ule 5 . . . precludes the outright release of a person shortly after the arrest[.]"). Such a requirement would force

---

[2] To the extent Defendant contends that his property should have been returned to him upon his release, and that law enforcement's retention of his property conferred an "advantage for the [government]" (Doc. 277 at 7), "if evidence is 'needed for an ongoing or proposed specific investigation,' law enforcement authorities are entitled to retain it." *Rodgers v. Knight*, 781 F.3d 932, 941 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 232 (2015) (quoting *Sovereign News Co. v. United States*, 690 F.2d 569, 578 (6th Cir. 1982). Defendant did not file a motion requesting the return of his property under Fed. R. Crim. P. 41(g), which allows "[a] person aggrieved by . . . the deprivation of property [to] move for the property's return."

officers to pursue charges even if they do not presently possess sufficient evidence to support a criminal complaint. *See United States v. Bloom*, 865 F.2d 485, 490 (2d Cir. 1989) ("[N]either the government nor defendants would benefit from a rule that might create incentives to prosecute cases that would otherwise be dropped[.]"). Nor is there any requirement that an arrestee be presented before a magistrate judge if that person is neither charged nor detained for an unreasonable amount of time.

In the case of Defendant's August 27, 2015 arrest, because "[n]o charges, either by Complaint or Indictment, were instituted at that time," "[t]here was . . . nothing on which to present Defendant to a Magistrate Judge for advice of charges or rights, appointment of counsel, or triggering of any discovery rights." *United States v. Robertson*, 2016 WL 3397725, at *11 (D. Ariz. June 21, 2016) (denying a defendant's motion for a new trial premised on a violation of Fed. R. Crim. P. 5(a)(1) where the defendant was released "a little more than two hours after arresting her"). Rule 5, itself, makes this point clear.[3]

Defendant's reliance on *United States v. Roberts*, 928 F. Supp. 910 (W.D. Mo. 1996) is misplaced. There, the defendant was detained without probable cause by state law enforcement agents acting at the direction of a federal prosecutor pursuant to a state "pick up" order which allegedly authorized a warrantless detention for twenty hours for

---

[3] Pursuant to Fed. R. Crim. P. 5(d), if a defendant is detained and charged with a felony, the magistrate judge must inform the defendant of:

> (A) [T]he complaint against the defendant, and any affidavit filed with it; (B) the defendant's right to retain counsel or to request that counsel be appointed if the defendant cannot obtain counsel; (C) the circumstances, if any, under which the defendant may secure pretrial release; (D) any right to a preliminary hearing; (E) the defendant's right not to make a statement, and that any statement made may be used against the defendant; and (F) that a defendant who is not a United States citizen may request that an attorney for the government or a federal law enforcement official notify a consular officer from the defendant's country of nationality that the defendant has been arrested—but that even without the defendant's request, a treaty or other international agreement may require consular notification.

Fed. R. Crim. P. 5(d)(1). None of the above rights apply if an arrestee is released without charges.

"investigative purposes." Holding the arrest itself unconstitutional because it was not supported by probable cause, a magistrate judge further found that "the arrest of [the] defendant pursuant to the Missouri 20-hour hold law was an unlawful pretext for investigative purposes, and that the government intentionally circumvented procedure in place to protect [the] defendant's constitutional rights." *Id.* at 938. At the time, *Whren* had not yet been decided. The magistrate judge recommended that the evidence against the defendant be suppressed in light of the twelve hours during which she was "held in custody without probable cause," without being presented to a judge, in "outrageous circumstances." *Id.* at 941. In adopting the magistrate judge's recommendation, the district court judge concluded that *Whren*, which had been recently decided, was inapplicable because the defendant was detained without probable cause pursuant to a state law "investigative tool" wielded at the direction of a federal agent and because the magistrate judge correctly forecasted the applicable test was an objective rather than a subjective one that discounted the arresting officer's motivations. *Id.* at 914-15.

In contrast, in this case, Defendant's arrest was supported by probable cause, he was detained for two hours for standard booking procedures, and he was released without charges. *Roberts*, which is not controlling precedent, it therefore easily distinguishable.

For the foregoing reasons, Defendant's motion to suppress evidence on the grounds that his arrest was pretexual, he was strip-searched without cause to believe he was concealing narcotics, and because the government did not present him to a magistrate judge after his August 27, 2015 arrest is DENIED.

## B.     Whether Ms. Banfield's Pretrial Identification Was Impermissibly Suggestive.

Defendant argues that law enforcement's use of a "single-suspect" identification procedure with Ms. Banfield was impermissibly suggestive and requests that her pretrial identification of him be suppressed. He further contends that the procedure was so suggestive that it "tainted any other identification procedures and any in-court identification." (Doc. 265-1 at 10.) The government counters that the identification

12

procedure was not unduly suggestive due to Ms. Banfield's "level of familiarity with the [D]efendant." (Doc. 271 at 6.)

"The linchpin for admissibility of identification testimony is reliability." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) (citing *Manson v. Brathwaite*, 432 U.S. 98, 106-07 n.9 (1977)). "A defendant's right to due process includes the right not to be the object of suggestive police identification procedures that create 'a very substantial likelihood of irreparable misidentification.'" *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Courts must exclude an identification "only if the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994) (alterations in original) (citation omitted).

The Second Circuit employs a two-step "sequential inquiry" in evaluating challenges to a witness's pretrial identification. *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). First, "[t]he court must . . . determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Id.* If the procedures were not impermissibly suggestive, then "no further inquiry by the court is required, and '[t]he reliability of properly admitted eyewitness identification . . . is a matter for the jury.'" *Id.* (quoting *Foster v. Cal.*, 394 U.S. 440, 442 n.2 (1969)). "In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility." *Maldonado-Rivera*, 922 F.2d at 973.

"[T]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Foster*, 394 U.S. at 443 (citation and internal quotation marks omitted). For this reason, the Second Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice, and, where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one." *Mysholowsky v. People of the State of N.Y.*, 535 F.2d 194, 197 (2d Cir. 1976); *see also United States v. Reid*, 517 F.2d 953, 966 (2d Cir. 1975)

13

(discussing the government's concession that an assault victim's identification of two assailants through "one photograph of each man," shown "[t]wo or three days" after their arrest, was "impermissibly suggestive"); *United States ex rel. John v. Casscles*, 489 F.2d 20, 24 (2d Cir. 1973) ("The showing of only two pictures, one of each suspect, to a possible witness and asking her if these are the two men she saw, or if she can identify these two men, is clearly impermissibly suggestive.").

In this case, the government "had ample time to prepare a non-suggestive photographic array" and cites no extenuating or exigent circumstances justifying law enforcement's single-photograph procedure. *United States v. Montgomery*, 150 F.3d 983, 992-93 (9th Cir. 1998) (holding an identification through presentment of one photograph of each alleged defendant to a witness one month after the defendants' arrests was "unnecessarily suggestive" and not compelled by exigent circumstances).

Even if "the pretrial procedures were unduly suggestive, the analysis requires a second step; the court must then weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures." *Maldonado-Rivera*, 922 F.2d at 973. The factors to be considered in analyzing independent reliability include: (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009) (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Ms. Banfield was familiar with Defendant prior to the identification, as evidenced by her self-incriminating admissions regarding her participation in alleged drug trafficking activities with Defendant. *See United States v. Crumble*, 2018 WL 1737642, at *2 (E.D.N.Y. Apr. 11, 2018) ("An in-court identification is . . . admissible, despite an improper pre-trial identification procedure, if the witness is familiar with the defendant prior to the incident."); *United States v. Mack*, 2013 WL 143360, at *6 (D. Vt. Jan. 11, 2013) (finding a pretrial identification based on a single photograph to be admissible as

14

independently reliable where the identifier "purchased drugs from [Defendant]; she was not a casual observer"); *United States v. Stewart*, 770 F. Supp. 872, 877 (S.D.N.Y. 1991) (holding that identification through bank surveillance photographs was independently reliable because the identifier "alleged that he and the defendant were co-conspirators").

Ms. Banfield described Defendant's visits to her home to law enforcement, which provided her with an ample opportunity to view Defendant at close range on several occasions.[4] Her identification was made in the course of an alleged drug trafficking conspiracy after Defendant was arrested in front of her apartment while a consensual search of that apartment (yielding drugs and drug proceeds) was underway. *See Manson*, 432 U.S. at 115-16 (finding a single-photograph pretrial identification to be admissible despite its suggestiveness when the identification occurred "only two days" after the crime; "[w]e do not have here the passage of weeks or months between the crime and the viewing of the photograph").

Although there is ample evidence that Ms. Banfield had an independently reliable basis for her identification, Defendant is correct that the record lacks evidence regarding her degree of attention, her level of certainty,[5] and the specific circumstances of her identification, including what Ms. Banfield may have been told by the law enforcement

---

[4] *See United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997) (holding that a witness's in-court identification was reliable, despite an unduly suggestive single-photograph pretrial identification, because "as [the defendant]'s co-conspirator during the bank robbery [the identifier] had more than an adequate opportunity to observe [the defendant]"); *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984) (finding an in-court identification based on a single-photograph pretrial identification to be reliable despite suggestiveness of the procedure because the identifiers, two of whom were co-conspirators, "had observed [the defendant] at close range on numerous occasions"); *United States v. Crumble*, 2018 WL 1737642, at *2 (E.D.N.Y. Apr. 11, 2018) (holding that an in-court identification would be sufficiently reliable because the identifier "had known [the defendant] for eight years," "had conducted previous narcotics transactions with [the defendant]," knew specific identifying information about the defendant including his phone number, and had "ample opportunity to observe [the defendant] during the course of this incident").

[5] *See also United States v. Castro-Caicedo*, 775 F.3d 93, 100 (1st Cir. 2014) (holding that despite the "lack of clarity" in the record, "certainty is at best a neutral factor, and here there is no indication of [the identifier]'s *lack* of certainty") (emphasis in original).

officer who showed her Defendant's photograph and any statements she may have made in response. In light of her generic description of Defendant as an African American male from New York, the government must proffer additional evidence before her pretrial identification and any in-court identification of Defendant is admitted. Should the government seek to present Ms. Banfield's identification at trial, it may proffer that evidence outside the presence of the jury.

For the foregoing reasons, Defendant's motion to suppress Ms. Banfield's identification is DENIED WITHOUT PREJUDICE. Defendant may renew his motion after the government makes the requisite factual proffer.

### C. Whether the Indictment Should Be Dismissed Pursuant to Fed. R. Crim. P. 48(b).

Defendant moves to dismiss the Third Superseding Indictment and presumably any previous indictments on the grounds that his alleged Fifth Amendment right to a prompt initiation of prosecution and his right to prosecution without delay under Fed. R. Crim. P. 48(b) were violated due to the delay between his arrest on August 27, 2015 and his initial indictment on March 22, 2018. He asserts that the "persistent pattern of oppressive and prejudicial delays in this action . . . have combined to prevent the defendant from adequately preparing a defense against the charges," as several witnesses have died[6] and "the memory of the defendant and agents involved in this matter have faded." (Doc. 265-1 at 14.)

Fed. R. Crim. P. 48(b) allows a court to "dismiss an indictment, information, or complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Under Fed. R. Crim. P. 48(b), federal courts "possess the inherent power, derived from the

---

[6] Since his initial arrest, Defendant alleges that two witnesses have died. The first, Ms. Banfield's former roommate, was her live-in boyfriend and an "alleged narcotics dealer whose testimony could [have] proved that the drugs found in her house [were] in fact not [Defendant's] and that [Ms.] Banfield had all reason to lie [throughout] this investigation." (Doc. 277 at 12.) The second, Tina Francis, was a source of information who "could have testified and been cross examined on the inconsistencies and misleading statements that were in the affidavit [accompanying the criminal complaint] prepared by Agent Persson[.]" *Id.* at 13.

common law, to dismiss a case for want of prosecution, whether or not there has been a Sixth Amendment violation." *United States v. Furey*, 514 F.2d 1098, 1103 (2d Cir. 1975) (citing cases). However, "[t]he rule clearly is limited to post-arrest situations." *United States v. Marion*, 404 U.S. 307, 319 (1971) (footnote omitted); *see also id.* at 312 n.4 ("[I]t is doubtful that Rule 48(b) applies in the circumstances of this case, where the indictment was the first formal act in the criminal prosecution of these appellees."). Accordingly, "[t]he federal seizure of an individual and subsequent release does not trigger Rule 48(b)." *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994).

A defendant who is arrested and released is not without protection from an unduly delayed prosecution. For most crimes, including the ones with which Defendant is charged, "the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges." *United States v. Ewell*, 383 U.S. 116, 122 (1966); *United States v. Feinberg*, 383 F.2d 60, 65 (2d Cir. 1967) (holding "the only lapse of time prior to arrest" that will activate a presumption of prejudice "is that established by the statute of limitations"). A narrow exception exists for prearrest delays that "impair the capacity of the accused to prepare his defense." *Feinberg*, 383 F.2d at 65. In such circumstances, the due process clause of the Fifth Amendment "requires the dismissal of an indictment because of preindictment delay only when the delay causes 'substantial prejudice' to the defense and the delay is an 'intentional device to gain tactical advantage over the accused.'" *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987) (quoting *Marion*, 404 U.S. at 324).

The government contends that Fed. R. Crim. P. 48(b) does not apply to Defendant's August 27, 2015 arrest. The court agrees. Defendant was released two hours post-arrest without the filing of a criminal complaint or an indictment. *See Benitez*, 34 F.3d at 1495 (affirming the district court's denial of defendant's motion to dismiss pursuant to Fed. R. Crim. P. 48(b) because defendants, who were released to state officials following their arrest, "were not held to answer . . . until . . . federal charges were filed"); *see also United States v. Caswell*, 2013 WL 1563093, at *2 (N.D. Cal. Apr.

11, 2013) (holding that Fed. R. Crim. P. 48(b) did not apply because the defendant "was cited and released").

Although Defendant argues that his initial arrest on August 27, 2015 offered the government a tactical advantage in "rais[ing] the drug amount involved in this case which in return will raise [his] guidelines" and by "adding additional defendants," (Doc. 277 at 11), this is not the type of prejudice for which a due process violation will be found. As the Supreme Court explained in *United States v. Lovasco*, 431 U.S. 783 (1977), "prosecutors are under no duty to file charges as soon as probable cause exists" because "[t]o impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'" *Id.* at 791 (quoting *Ewell*, 383 U.S. at 120); *see also Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."). This maxim is particularly important in cases involving multi-defendant "criminal transaction[s]" such as this one:

[C]ompelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice. In other cases, the prosecutor would be able to obtain additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.

*Lovasco*, 431 U.S. at 792-93. As a result, "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796. Any other approach would be untenable because "insisting on immediate prosecution once sufficient evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful

18

cases in favor of early and possibly unwarranted prosecutions." *Id.* at 793. A defendant's Fifth Amendment due process rights are thus not violated when the government "refuses to seek [an] indictment[] until [it] is completely satisfied that [it] should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Id.* at 795.

Because Defendant concedes that he cannot ascertain whether the two witnesses who died would present favorable testimony, "[t]he assertion that a missing witness might have been useful does not show the 'actual prejudice' required by *Marion*." *United States v. Mays*, 549 F.2d 670, 677 (9th Cir. 1977) (emphasis supplied) (citation and internal quotation marks omitted); *see also Feinberg*, 383 F.2d at 66 (holding that government witnesses' memory loss "would prejudice the Government rather than [Defendant]"). "In light of the applicable statute of limitations," the possibilities that "memories will dim, witnesses become inaccessible, and evidence be lost" are not "in themselves enough to demonstrate that [Defendant] cannot receive a fair trial and to therefore justify the dismissal of the indictment." *Marion*, 404 U.S. at 326.

For the reasons stated above, Defendant's motion to dismiss the Indictment pursuant to Fed. R. Civ. P. 48(b) is DENIED.

## D. Whether the Indictment Should Be Dismissed Pursuant to the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161(b) and 3162(a)(1).

Defendant argues that the delay between his arrest on August 27, 2015 and his indictment on March 22, 2018 violated his Sixth Amendment right to a speedy trial as well as the Speedy Trial Act because an indictment was not returned within thirty days of his arrest. In support of this claim, he argues that "[a]nalysis of the policies behind the Speedy Trial Act confirms that perhaps more significant than the actual filing of charges is the defendant's subjective belief that charges have been brought and are pending." (Doc. 265-2 at 5.)[7]

---

[7] The cases Defendant relies on are inapposite. The Supreme Court abrogated *United States v. Cabral*, 475 F.2d 715 (1st Cir. 1973). *See United States v. Dowdell*, 595 F.3d 50, 62 (1st Cir. 2010) (footnote omitted) ("A quarter-century of consistent authority impels us to . . . hold that

The Sixth Amendment's guarantee of a speedy trial "is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *Marion*, 404 U.S. at 313. "Until this event occurs, a citizen suffers no restraints on his liberty and is not the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer." *Id.* at 321. Even though the "[p]assage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself[,] . . . this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context." *Id.* at 321-22.

After his August 27, 2015 arrest, Defendant was not charged with an offense. The Sixth Amendment was therefore neither implicated nor violated by any alleged delay. *See id.* at 313 (holding that a three-year delay between the "end of the criminal scheme charged and the return of indictment" did not violate the Sixth Amendment because the amendments' protections are triggered only "when the putative defendant in some way becomes an 'accused,' an event that occurred in this case only when the [defendants] were indicted[.]").

The Speedy Trial Act, enacted "to implement the accused's constitutional right to a speedy trial," *United States v. Hillegas*, 578 F.2d 453, 457 (2d Cir. 1978), was also not violated during the time period between Defendant's August 27, 2015 arrest and his March 22, 2018 indictment. Pursuant to § 3161(b) of the Act, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." Courts have "'uniformly [held] that an individual is not arrested under [§] 3161(b) until he is taken into custody after a federal

Supreme Court precedent has abrogated *Cabral*."). In *United States v. Beberfeld*, 408 F. Supp. 1119 (S.D.N.Y. 1976) and *United States v. Lopez*, 426 F. Supp. 380 (S.D.N.Y. 1977), the courts determined the "arrest" date under a federal district court's speedy trial plan, not pursuant to § 3161(b) of the Speedy Trial Act. *See Beberfeld*, 408 F. Supp. at 1124-25; *Lopez*, 426 F. Supp. at 384-86.

arrest for the purpose of responding to a federal charge.'" *Bloom*, 865 F.2d at 490 (citing *United States v. Johnson*, 815 F.2d 309, 312 (5th Cir. 1987)). Because the Speedy Trial Act "was the product of legislative compromise," it has "very limited application" and "must be read strictly." *United States v. Gaskin*, 364 F.3d 438, 451 (2d Cir. 2004) (citing *United States v. Napolitano*, 761 F.2d 135, 137 (2d Cir. 1985)). "Accordingly, [courts in the Second Circuit] apply §§ 3161(b) and 3162(a)(1) to pre-indictment delay in pursuing only the specific charges alleged in a pending complaint." *Id.* at 452. An individual who is "promptly" released from federal custody "without the Government filing formal charges" is not "arrest[ed] within the meaning of [§] 3161(b)." *Bloom*, 865 F.2d at 490 (citation and internal quotation marks omitted); *see also United States v. Bagster*, 915 F.2d 607, 609-10 (10th Cir. 1990) ("[A]n arrest followed by an unconditional release without formal charges is not an 'arrest in connection with such charges' sufficient to trigger the time requirements of the Speedy Trial Act."); *United States v. Davis*, 785 F.2d 610, 613 (8th Cir. 1986) ("[A]n arrest under § 3161(b) means a formal arrest, such as when a complaint, information or indictment has been filed."); *United States v. Solomon*, 679 F.2d 1246, 1253 (8th Cir. 1982) ("The speedy trial clause affords no protection during a period that charges are not pending.").

On August 27, 2015, Defendant was "promptly released from federal custody without the Government filing formal charges." *Bloom*, 865 F.2d at 491 (citing *Johnson*, 815 F.2d at 312). As a result, the Speedy Trial Clock was not triggered. *Bloom*, 865 F.2d at 491 (holding that the speedy trial clock did not start for a defendant when he was released from federal custody). When Defendant was arrested again on March 9, 2018, a formal complaint was filed against him on March 15, 2018, and an indictment was returned by March 22, 2018, within the Speedy Trial Act's thirty-day period. 18 U.S.C. § 3161(b).

To the extent Defendant argues that his right to a speedy trial began at the time of his initial arrest because the disabilities associated with being arrested, such as the retention of his fingerprints, photographs, and other evidence, led him to believe he would soon be charged, "[t]he Speedy Trial Act does not protect the man whose peace of

21

mind is disturbed because, though he is not under arrest or out on bail and no charge has been lodged against him, he is likely to be charged." *United States v. Janik*, 723 F.2d 537, 542 (7th Cir. 1983).[8] "Unless and until a formal criminal charge was filed against him, neither he nor the public generally could have any legitimate interest in the prompt processing of a nonexistent case against him." *Hillegas*, 578 F.2d at 458.

For the reasons stated above, the court therefore DENIES Defendant's motion to dismiss the Indictment under the Sixth Amendment and the Speedy Trial Act.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress (Doc. 265-1) is DENIED, and Defendant's motion to dismiss the Indictment (Doc. 265-2) is DENIED. The government must proffer additional evidence should it seek to introduce Ms. Banfield's pretrial identification and any in-court identification by her at trial.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 26th day of November, 2019.

Christina Reiss, District Judge
United States District Court

---

[8] *See also Hillegas*, 578 F.2d at 458 (holding that approximately three years between the dismissal of the original indictment and a new indictment did not violate the Speedy Trial Act because the defendant "was free to come and go as he pleased[,]" and "was not subject to public obloquy, disruption of his employment or more stress than any citizen who might be under investigation but not charged with a crime"); *United States v. Flores*, 501 F.2d 1356, 1359-60 (2d Cir. 1974) (per curiam) (examining a time period when defendant was under investigation and not charged and holding there were no speedy trial concerns because "[d]uring this period appellant was not subject to any of the disabilities associated with being under arrest, the subject of a complaint or indictment, or in the midst of a criminal prosecution," and thus "was under no more jeopardy than any other citizen[.] [T]he fact that he might have been under investigation has no more effect after the dismissal . . . than it would have had before his arrest, that is, none").